LOUIS H. CASTORIA (SBN: 95768)
lcastoria@kdvlaw.com
SHEILA M. PHAM (SBN: 293673)
spham@kdvlaw.com
KAUFMAN DOLOWICH & VOLUCK LLP
425 California Street, Suite 2100
San Francisco, CA 94104
Telephone:  (415) 926-7600
Facsimile:   (415) 926-9601

Attorneys for Plaintiff
IRONSHORE SPECIALTY INSURANCE COMPANY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IRONSHORE SPECIALTY INSURANCE COMPANY, <br><br> Plaintiff, <br><br> vs. <br><br> STONE, MEYER, GENOW, SMELKINSON & BINDER, LLP; and NEIL ETTIN MEYER, an individual, <br><br> Defendants. | Case No.: <br><br> **COMPLAINT FOR DECLARATORY JUDGMENT** <br> **Diversity Jurisdiction:** <br> **28 USC §§1332 and 2201** <br> (Rescission of Insurance Policy; Declaration of Rights) |

This Court has jurisdiction over this action under Title 28 of the United States Code sections 1332 and 2201. Plaintiff, IRONSHORE SPECIALTY INSURANCE COMPANY ("Ironshore" or "Plaintiff"), brings this action against STONE, MEYER, GENOW, SMELKINSON & BINDER, LLP, and NEIL ETTIN

MEYER (jointly "Defendants" or singly, "Stone Meyer" and "Mr. Meyer"), and each of them, for a Declaratory Judgment, and states as follows:

## I.      INTRODUCTION

1.      This declaratory judgment action arises from misrepresentations and/or concealments of material information and breaches of warranties made in a written application dated January 12, 2015 for lawyers professional liability insurance (the "Application"), which Stone Meyer submitted to Ironshore, and, based upon which Ironshore issued a policy of lawyers professional liability insurance to Stone Meyer incepting on February 28, 2015, policy number 002311800 (the "Policy"). The Policy provides coverage (subject to its terms and conditions) on a "claims made and reported" basis from February 28, 2015 to February 28, 2016, at 12:01 AM each date (the "Policy Period").

2.      Attached to this Complaint as Exhibit "1" is a true, correct, and complete photocopy of the Application, other than the addition of sequential pagination, which is made a part hereof by this reference.

3.      Attached to this Complaint as Exhibit "2" is a true, correct, and complete photocopy of the Policy, including all endorsements and the notice issued therewith, other than the addition of sequential pagination, which is made a part hereof by this reference.

4.      Defendants have tendered a lawsuit to Ironshore for defense and indemnification under the Policy, *Jane Doe, Plaintiff v. Neil Ettin Meyer, individually; Stone, Meyer, Genow, Smelkinson, and Binder LLP, a California limited liability partnership, and Does 1 through 100, inclusive*, Los Angeles County Superior Court civil action BC 578370 (the "Jane Doe Action"), which bears a filing date of April 10, 2015.

5.      Attached to this Complaint as Exhibit "3" is a true, correct, and complete photocopy of the Complaint for Damages and Civil Case Cover Sheets in the Jane Doe Action (jointly, the "Doe Complaint"), other than the addition of

sequential pagination, which is made a part hereof by this reference.  The Doe Complaint alleges causes of action against the Defendants for Intentional Infliction of Emotional Distress, Breach of Fiduciary Duty, and Sexual Harassment in Violation of [California] Civil Code section 51.9.

6.     Ironshore hereby gives notice to Defendants of Ironshore's rescission of the Policy, and hereby offers to restore to Stone Meyer the premium payment that Ironshore received, upon Defendants' written agreement that the Policy is rescinded *ab initio*, or upon a final and non-appealable Order by the Court declaring the Policy to be rescinded *ab initio*.

7.     Ironshore seeks two alternative remedies in this declaratory judgment action: (a) a declaration by the Court that the Policy has been rescinded *ab initio*; and (b) a declaration by the Court determining that the Jane Doe Action is not covered under the Policy for reasons specified herein, thus resolving a present, material controversy between Ironshore and the Defendants as to their respective rights and duties under the Policy.

## II.     JURISDICTION AND VENUE; THE PARTIES

8.     This Court has diversity jurisdiction pursuant to 28 U.S.C. sections 1332 and 2201.

9.     Ironshore is a corporation domiciled in the State of Arizona and having its principal place of business in the Borough of Manhattan, City of New York, State of New York.  The Application was accepted by Ironshore at its Manhattan office.

10.    Mr. Meyer is a resident of the State of California, having his principal place of business in Beverly Hills, California.

11.    Stone Meyer is a California limited liability partnership, having its principal place of business in Beverly Hills, California.

12.    Venue for this action is proper in this Court pursuant to 28 U.S.C. section 1391(b).

13.     Ironshore, Mr. Meyer, and Stone Meyer are jointly referred to herein as the "Parties."

## III.   DIVISION ASSIGNMENT

14.     This action is properly assigned in the Western Division of this Court as the Defendants have their principal places of business within this Division, and many of the acts underlying the Jane Doe Action took place within this Division.

## IV.   FACTUAL BACKGROUND

### A.   THE APPLICATION AND THE POLICY

15.     Prior to the issuance of the Policy, Defendants had not been insured under any lawyers professional liability insurance policies issued by Ironshore. Stone Meyer submitted the Application to Ironshore using a form that they had completed for submission to Certain Underwriters at Lloyd's, London, dated January 12, 2015.  The Policy identifies the January 12, 2015 application as the one upon which it relied in issuing the Policy, in Endorsement #2 (please see Exhibit 2, page 19 of 21), which states in part:

> In consideration of the Premium charged, it is understood and agreed that the **Insurer** has relied upon the statements and representations contained in the below referenced application (including materials submitted thereto and, if such application is a renewal application, all such previous policy applications, and their attachments and materials, for which this Policy is a renewal or succeeds in time) as being accurate and complete.  It is further understood and agreed that the **Insured** warrants and represents to the **Insurer** that the statements and representations made in the below referenced application were accurate on the Date Signed and that the **Insured** hereby reaffirms each and every statement made in the below referenced application as accurate as of Date Signed as if it was made to the **Insurer** on such date.  All such statements and representations shall be deemed to be material to the risk assumed by the **Insurer**, are the basis of this Policy and are to be considered as incorporated into this Policy.

16.     The Application instructs the applicant, in part (Please see Exhibit 1, page 1 of 18):

APPLICANT'S INSTRUCTIONS

A. ALL QUESTIONS MUST BE ANSWERED COMPLETELY, PLEASE TYPE OR PRINT CLEARLY.  IF ANY QUESTIONS ARE CONSIDERED "NOT APPLICABLE", PLEASE EXPLAIN WHY.

. . .

F. THIS APPLICATION MAY ASK FOR DETAILS ON ACTIVITIES FOR WHICH NO COVERAGE IS PROVIDED UNDER THE INSURANCE BEING REQUESTED. PLEASE CONSULT WITH YOUR BROKER OR INSURANCE AGENT FOR DETAILS OF YOUR PROPOSED COVERAGE.

17.     Defendants were asked in the Application, "Does the Applicant currently, or did the Applicant at any time . . . in the last Five Years provide any other Professional Services apart from Legal Work?" Stone Meyer checked the "No" box next to this question. (Please see Exhibit 1, page 2 of 18.)

18.     Stone Meyer represented in the Application that its Activities in "any area of law that represents more than 10% of the Applicant's practice" were 88% Entertainment (excluding Money Management), 10% Copyright/Patent, and 2% Corporate/Partnership Formation/Alteration.  (Please see Exhibit 1, page 3 of 18.)

19.     Question 10B of the Application asked, "After enquiry, have any claims or suits been made in the last Ten Years against the Applicant or any past or present Owners, Partners, Shareholders, Corporate Officers, Associates, Employed Lawyers, Contract Lawyers, Employees or it predecessors in business?" Stone Meyer checked the "Yes" box next to this question, and responded that there had been one such claim or suit.  (Please see Exhibit 1, page 8 of 18.)  In Supplement 6 to the Application Stone Meyer identified that claim as a defamation matter in which a company's rights to distribute a film were denied by a Stone Meyer

attorney.  Mr. Meyer was not shown as being involved in that claim.  (Please see Exhibit 1, pages 17-18 of 18.)

20.    Question 10C of the Application asked, "After enquiry, are any persons listed in Supplement 1 aware of any circumstances, allegations, tolling agreements or contentions as to any incident which may result in a claim being made against the Applicant or any of its past or present Owners, Partners, Shareholders, Corporate Officers, Associates, Employed Lawyers, Contract Lawyers, Employees or its predecessors in business?" Stone Meyer checked the "No" box next to this question.  (Please see Exhibit 1, page 8 of 18.)

21.    Mr. Meyer is one of the listed "individuals from whom coverage is sought" in Supplement 1 to the Application.  (Please see Exhibit 1, page 11 of 18.)

22.    The Application bears a signature of Douglas R. Stone, APC on behalf of Stone Meyer, below the following statement:

(Please also see Exhibit 1, page 10 of 18.)

The Applicant declares and warrants that, after enquiry, to the best knowledge of all persons to be insured the statements set forth herein and in any attachments made hereto are true and no material facts have been suppressed omitted or misstated.  Underwriters reserve the right to deny or rescind coverage on any Policy that is issued as a result of this Application if, in the statements set forth herein and in any attachments made hereto it is found that material information has been omitted, suppressed or misstated.

Underwriters also reserve the right to amend the terms, conditions and limitations, coverage of any Policy that is issued as a result of this application, if subsequent to the date of this application, but prior to the inception date of such policy, there are any material alterations to the information contained herein.  In the event of such material alteration, as aforesaid, the Applicant agrees to give immediate written notice to Underwriters and such notice shall attach to and form part of this application.

Signing this application does not bind the Applicant or Underwriters to complete the Insurance, but it is agreed that the statements and particulars contained herein will be relied upon by Underwriters should a Policy be issued.

This application is signed on behalf of all Owners, Partners, Shareholders, Corporate Officers and Employees.

Douglas R. Stone, A Professional Corporation

By: _____     President/Partner _____
AUTHORIZED SIGNATURE OF APPLICANT     TITLE
Must be a principal of the Applicant and a person at risk

_____     February 28, 2015 _____
Date     Effective Date Requested for this Insurance

PLEASE MAKE CERTAIN ALL QUESTIONS ARE ANSWERED AND THAT ALL APPLICABLE SUPPLEMENTS ARE COMPLETED.
THIS APPLICATION WILL NOT BE PROCESSED UNLESS ALL QUESTIONS ON THIS APPLICATION AND APPLICABLE SUPPLEMENTS ARE ANSWERED.

23.     In issuing the Policy to Stone Meyer, Ironshore reasonably relied upon the veracity of the facts stated in the Application, and on the declaration and warranty by Stone Meyer's President and Partner.

B.     UNDISCLOSED PRE-APPLICATION CLAIMS AND CIRCUMSTANCES

24.     In the Doe Complaint, plaintiff Jane Doe states that she uses a fictitious name because of her allegations of sexual abuse.  In referring to the plaintiff in the Jane Doe Action, Ironshore will likewise use her fictitious name. Ironshore reserves the right to seek leave from the Court to amend this Complaint to state Jane Doe's true name if her true identity is used in the Jane Doe Action, or it otherwise becomes appropriate to do so.

25.     On information and belief, Ironshore alleges that Jane Doe was a client of Stone Meyer during some or all of the times alleged in the Doe Complaint.

26.     On information and belief, Ironshore alleges that Mr. Meyer and/or his counsel has admitted in public statements that he did have a sexual relationship with Jane Doe during times when she was a client of Stone Meyer.

27.     On information and belief, Ironshore alleges that Mr. Meyer knows the true identity of Jane Doe.

28.     On information and belief, Ironshore alleges that Mr. Meyer was aware, prior to the date of the Application, of circumstances, allegations, tolling agreements or contentions as to incidents that occurred in his relationship with Jane Doe which might result in a claim being made against him and/or Stone Meyer.

29.     On information and belief, Ironshore alleges that Jane Doe made statements to Mr. Meyer before the date of the Application that constituted a claim by her against him.

30.     According to official records of the Los Angeles County, California Superior Court, Mr. Meyer, though counsel, filed on March 25, 2014 a Request for Domestic Violence Restraining Order (the "RDVRO") against a woman who identified herself as a former client.  The RDVRO states, in part:

    a.  Mr. Meyer had a "dating relationship" with the woman, whom he described as an "ex-girlfriend," but had "broken it off three times."

    b.  The woman "had previously attempted to extort me[.]"

    c.  The woman wrote a letter to the California State Bar Association on or before March 20, 2014, charging that she left Mr. Meyer as a client because "I no longer felt Neil was negotiating the best deals for me." She asked that the State Bar "accept this letter as a formal complaint."

    d.  Mr. Meyer sent the woman an email on February 6, 2014, after she had demanded from him a payment of $40,000 and a written apology, confirming, "I reluctantly agreed to 30K and the apology."  However, she demanded that Mr. Meyer "go on a trip with [her] for 10 days," or "[she] will go to the bar on me.  That, [name omitted] is blackmail."

    e.  The woman made demands that he have sex with her.

    f.  Mr. Meyer had his attorney send her a cease and desist letter.

    g.  The woman "sent mass emails to members of my firm which include false and malicious statements intended to hurt me professionally and personally, and damage my relationship with my colleagues, and in the entertainment community generally."

    h.  "She said we would be at war."

31.     The RDVRO contains other facts and allegations known to Mr. Meyer at the time it was filed, which further establish that the woman in question had made a claim against him and had put him on notice of facts, contentions, and circumstances, allegations, and/or incidents that might result in a claim being made against him and/or Stone Meyer.

32.     The RDVRO sought a temporary restraining order, barring the woman from coming within 100 yards of Mr. Meyer, his home, his workplace, and his vehicle, and barring her from contacting "anyone who works at my law firm[.]"

33.     Ironshore does not allege that the statements attributed to the woman who is identified in Mr. Meyer's Request for Domestic Violence Restraining Order are true, nor whether she is or is not the same person as Jane Doe.  Ironshore is not including her name in this Complaint, though it is in the public record, in case she is Jane Doe. Ironshore is not at this time attaching the Request for Domestic Violence Restraining Order and its supporting papers as an exhibit to this Complaint. Ironshore will file such documents under seal with the Court before they are used in evidence.

34.     On information and belief, Ironshore alleges that Mr. Meyer was aware, prior to the date of the Application, of facts, circumstances, allegations, tolling agreements or contentions as to incidents that occurred, as related by him on the record in his Request for Domestic Violence Restraining Order and its supporting papers, which did or might result in a claim being made against him and/or Stone Meyer.

35.     On information and belief, Ironshore alleges that the woman referred to in Mr. Meyer's Request for Domestic Violence Restraining Order and its supporting papers made a claim against Mr. Meyer before the date of the Application.

36.     Stone Meyer did not disclose any of the information relating to the matters summarized in paragraphs 23 through 35, above, in the Application.

37.     On May 20, 2015, after having received notice of the Jane Doe Action from Stone Meyer's insurance broker, Ironshore sent a letter by email and certified mail to Stone Meyer, denying coverage for the Doe Action on the basis that the Jane Doe Action does not allege the rendering or failure to render Professional Legal Services, and reserving its rights to deny or limit coverage on other bases,

including possible misstatements or omission in the Application.  Attached to this Complaint as Exhibit "4" is a true, correct, and complete photocopy of Ironshore's May 20, 2015 letter, other than the addition of sequential pagination, which is made a part hereof by this reference.

38.     On August 7, 2015 the law firm Liner LLP sent a letter by email and U.S. mail to Ironshore, disputing Ironshore's coverage position as stated in Ironshore's May 20, 2015 letter.  Attached to this Complaint as Exhibit "5" is a true, correct, and complete photocopy of Liner LLP's August 7, 2015 letter, other than the addition of sequential pagination, which is made a part hereof by this reference.

## COUNT I
### Ironshore v. Defendants
### (Rescission of the Policy)

39.     Ironshore incorporates and expressly realleges Paragraphs 1 through 38 as though fully set forth herein.

40.     Ironshore reasonably relied on the misrepresentations and/or omissions in the Application and on the declaration and warranty by Stone Meyer's President and Partner in considering Stone Meyer as a potential insured, and in issuing the Policy to Stone Meyer.

41.     The Policy defines the "Application" as meaning "each and every signed application submitted to the Insurer for consideration of insurance together with any attachments to such applications, other material submitted therewith or incorporated therein, and any other documents submitted in connection with the underwriting of this Policy."  (Please see Exhibit 2, Section II, A., page 7 of 21.)

42.     The information misrepresented to and concealed from Ironshore in the Application was material to Ironshore's assessment of its risks in issuing the Policy to Stone Meyer.

43.     Ironshore would not have issued the Policy, or would have done so on different terms and conditions, had it known about the facts and communications admitted by Mr. Meyer.

44.     Stone Meyer's failure to disclose the facts, circumstances, allegations, contentions and incidents outlined above, and additional facts and allegations stated in the RDVRO, constituted a breach of the declaration and warranty made by Stone Meyer in the Application.

45.     Ironshore is ready, willing and able to return to Stone Meyer the premium it received for the Policy, and as stated in this Complaint, it has offered to do so and has given notice of rescission to Stone Meyer.

46.     Ironshore is informed and believes, and thereon alleges, that an actual, justiciable controversy now exists between Ironshore and Defendants, in that Ironshore contends that it has validly rescinded the Policy pursuant to California Civil Code sections, 1689 and 1691, and California Insurance Code sections 331, 338, 447, and 650, and other authority, whereas Defendants do not accept that the Policy is rescinded.

47.     Ironshore has no other speedy and adequate remedy at law to effect a rescission of the Policy that is binding upon Defendants, and thus seeks a judicial declaration that the Policy is rescinded and that the premium received by Ironshore for the Policy shall be returned to Stone Meyer.

WHEREFORE, Ironshore prays for relief as set forth hereinafter.

## COUNT II

### Ironshore v. Defendants
### (Declaration of Non-Coverage Under the Policy)

48.     Ironshore incorporates and expressly realleges Paragraphs 1 through 47 as though fully set forth herein.

49.     As and for a separate, independent, and alternative basis for relief, Ironshore contends that if, for any reason, a declaration of the rescission of the

Policy is not granted the Court should grant a declaratory judgment to Ironshore, finding that it has no duty to defend or indemnify the Defendants in the Jane Doe Action.

50.    Ironshore is informed and believes, and thereon alleges, that an actual, justiciable controversy now exists between Ironshore and Defendants, in that Ironshore contends that the Policy does not afford coverage to Defendants for their for defense or indemnification in the Jane Doe Action, for each of the following, independent, and dispositive bases, whereas Defendants do not accept that any of these bases is dispositive:

    a.  <u>Claim first made before the Policy Incepted</u>

       If Jane Doe is the same person against whom Mr. Meyer filed the RDVRO is the same person as Jane Doe, her claim against him was first made before the Policy incepted, and thus was not first made against the Insured during the Policy Period and reported to Ironshore during the Policy Period, as is required under Section I, A of the Policy, "Insuring Agreements."  (Please see Exhibit 2, page 6 of 21.)

       1.  Under the Policy, "'**Claim**' shall mean a demand received by an **Insured** for money or services, including the service of suit or institution of arbitration proceedings against the **Insured**." (Please see Exhibit 2, page 7 of 21, paragraph C, emphasis in original.)

       2.  The woman who demanded $40,000 from Mr. Meyer, as he admitted in the RDVRO, made a "claim" against him under the above definition.

       3.  The claim for $40,000 and other consideration as described by Mr. Meyer in his RDVRO was made before the inception date of the Policy Period.

b. <u>Professional Legal Services</u>

Jane Doe's claim against Defendants in the Jane Doe Action does not "arise out of the rendering of or failure to render **Professional Legal Services**," as is required under Section I, A of the Policy, "Insuring Agreements." (Please see Exhibit 2, page 6 of 21, emphasis in original.) Jane Doe does not allege any act, error, or omission by Mr. Meyer in any of the legal services provided by Stone Meyer to its clients as described in the Application.

1. Under the Policy, "'**Professional Legal Services**' shall mean legal services and activities performed for others as a lawyer, and including pro bono legal services, services as a notary public, arbitrator, mediator, title insurance agent, designated issuing lawyer to a title insurance company, fiduciary, services rendered as a member of a bar association, ethics, peer review, formal accreditation board or similar professional boards or committees, or the publication or presentation of research papers or similar materials by an **Insured** but only if the fees generated from such publication or presentation are not greater then thirty thousand dollars ($30,000). **Professional Legal Services** shall include services as an administrator, conservator, receiver, executor, guardian, or in any similar fiduciary capacity, or trustee, if such services are usual and customary to the practice of law and are in the rendering of professional services to others in an attorney client relationship." (Please see Section II, M of the Policy, Exhibit 2, page 8 of 21, emphasis in original.)

2. The events and conduct complained of in the Jane Doe Action

COMPLAINT FOR DECLARATORY JUDGMENT

are not Professional Legal Services within the definition given
that term in the Policy.

c.  Prior Knowledge

The Policy provides that "The Insurer shall not be liable to make any
payments in connection with any Claim made against any Insured . . .

"E. alleging, arising out of, based upon or attributable to
**Professional Legal Services** if an **Insured**, prior to the
effective date of the first Lawyers Professional Liability Policy
issued by the **Insurer** to the **Insured**, had knowledge of the
circumstances that gave rise to the **Claim** and reason to believe
that a **Claim** might result[.]"  (Please see Section III, E of the
Policy, Exhibit 2, page 9 of 21, emphasis in original.)  Mr.
Meyer is an Insured under the Policy.  Ironshore alleges on
information and belief that he had knowledge of the
circumstances that gave rise to Jane Doe's claim against him
before the inception date of the Policy.

d.  Related Professional Services

The Policy defines "Related Professional Services" as "**Professional
Legal Services** that are the same, related or continuous, or
**Professional Legal Services** that arise from a common nucleus of
facts.  **Claims** can allege **Related Professional Legal Services**
regardless of whether such **Claims** involve the same or different
claimants, **Insureds** or legal causes of action.  (Please see Section II,
O of the Policy, Exhibit 2, page 9 of 21, emphasis in original.)  On
information and belief, Ironshore alleges that the Jane Doe Action
arises from a common nucleus of facts with the matters alleged by the
woman against whom Mr. Meyer brought the RDVRO and the facts,

circumstances, allegations, contentions and incidents alleged by Jane Doe against Mr. Meyer before the Policy incepted. Under Section V, D of the Policy "More than one **Claim** involving the same **Professional Legal Services** or **Related Professional Legal Services** of one or more **Insureds** shall be considered a single **Claim**[.] . . . All such **Claims** constituting a single **Claim** shall be deemed to have been made on . . . the earliest date on which any such **Claim** was first made[.]" (Please see Section V, D of the Policy, Exhibit 2, page 11 of 21, emphasis in original.) The claim in the Jane Doe Action thus is deemed first made before the Policy incepted, and is not afforded coverage under the Policy.

e.  <u>Prior Proceedings</u>

Section III, C of the Policy provides, "The **Insurer** shall not be liable to make any payments in connection with any **Claim** . . . made against any **Insured**:  alleging, arising out of, based upon or attributable to any pending or prior civil, criminal, administrative or investigative proceeding involving the **Insured** as of the effective date of the first Lawyers Professional Liability Policy issued by the **Insurer** to the **Insured** or any **Professional Legal Services** or **Related Professional Legal Services** or any fact, circumstance or situation underlying or alleged in such proceedings[.]" (Please see Section III, C of the Policy, Exhibit 2, page 9 of 21, emphasis in original.) On information and belief, Ironshore alleges that the Jane Doe Action alleges, arises out of, is based upon or is attributable to the prior proceedings commenced by the woman against whom Mr. Meyer commenced the RDVRO, and who formally complained against Mr. Meyer to the California State Bar Association, both proceedings having been

COMPLAINT FOR DECLARATORY JUDGMENT

initiated before the inception date of the Policy.

f.  <u>Known Loss</u>

When an insured such as Mr. Meyer knows or has reason to know, before the inception date of an insurance policy, that there is substantial probability that he will suffer or has already suffered a loss or claim based on another's loss, that loss is uninsurable under the policy because the risk of liability is no longer unknown.

g.  <u>Willful Acts, Deliberately Fraudulent or Criminal Acts</u>

The Policy excludes from coverage "deliberately fraudulent or criminal acts of an **Insured**, provided, however, this exclusion shall only apply when it is finally adjudicated that such conduct occurred[.] (Please see Section III, A(2) of the Policy, Exhibit 2, page 9 of 21, emphasis in original.)  In addition, Section 533 of the California Insurance Code states: "An insurer is not liable for a loss caused by the willful act of the insured; but he is not exonerated by the negligence of the insured, or of the insured's agents or others."  In the context of this case, Mr. Meyer is a named partner in Stone Meyer.  In addition to the other bases for non-coverage asserted in this Complaint, Ironshore asserts that the Policy does not provide coverage for defense or indemnity under the facts alleged.

51.  Ironshore has no other speedy and adequate remedy at law to ascertain the rights and obligations of the Parties under the Policy, and thus seeks a judicial declaration that the Policy does not provide coverage for defense or indemnity to Defendants in the Jane Doe Action.

WHEREFORE, Ironshore prays for relief as set forth below.

## **PRAYER FOR RELIEF**

Ironshore prays for judgment on the foregoing counts for the following

relief:

1. Count One:  For a judicial declaration that the Policy is rescinded *ab initio* and that the premium received by Ironshore for the Policy shall be returned to Stone Meyer.

2. Count Two:  For a judicial declaration of the rights and obligations of the Parties under the Policy, to wit, that under any or all of the bases alleged in Count Three of this Complaint the Policy so that it provides no coverage, neither for defense nor indemnity, to Defendants for the Jane Doe Action.

3. On all Counts:  For attorney's fees and costs incurred herein, to the extent permissible by law, and for such other and further relief as the Court may award in the interests of justice.

DATED:  August 19, 2015          **KAUFMAN DOLOWICH & VOLUCK, LLP**

Louis H. Castoria
Sheila M. Pham
Attorneys for Plaintiff
IRONSHORE SPECIALTY INSURANCE
COMPANY

4829-4843-1911, v. 1

- 17 -
COMPLAINT FOR DECLARATORY JUDGMENT

# EXHIBIT 1

# LLOYD'S

## LLOYD'S OF LONDON

APPLICATION FOR
## LAWYERS PROFESSIONAL LIABILITY INSURANCE
"WITH CERTAIN UNDERWRITERS AT LLOYD'S"
THIS APPLICATION IS FOR A
"CLAIMS MADE" INSURANCE POLICY

### APPLICANT'S INSTRUCTIONS

**A.** ALL QUESTIONS MUST BE ANSWERED COMPLETELY. PLEASE TYPE OR PRINT CLEARLY. IF ANY QUESTIONS ARE CONSIDERED "NOT APPLICABLE", PLEASE EXPLAIN WHY.
**B.** PLEASE USE THE COMMENTS LINE(S) FOR ADDITIONAL INFORMATION OR CONTINUE ON A SEPARATE ADDENDUM INDICATING THE QUESTION NUMBER/SUPPLEMENT.
**C.** PLEASE COMPLETE THE APPLICATION FORM AND SUPPLEMENTS WHERE REQUIRED.
**D.** THIS APPLICATION AND ALL SUPPLEMENTS MUST BE SIGNED AND DATED BY A PRINCIPAL OF THE FIRM.
**E.** THE TERM "LAWYER" IN THIS APPLICATION SHALL MEAN ANY PARTNER, EMPLOYED LAWYER, "OF COUNSEL" OR CONTRACT LAWYER.
**F.** THIS APPLICATION MAY ASK FOR DETAILS ON ACTIVITIES FOR WHICH NO COVERAGE IS PROVIDED UNDER THE INSURANCE BEING REQUESTED. PLEASE CONSULT WITH YOUR BROKER OR INSURANCE AGENT FOR DETAILS OF YOUR PROPOSED COVERAGE.

---

1. A. Name of Applicant: **STONE, MEYER, GENOW, SMELKINSON & BINDER, LLP**

☐ Individual   ☐ Partnership   ☐ Professional Corporation   ☒ Ltd. Liability Partnership

B. Address: **9665 Wilshire Boulevard, Fifth Floor**

City: **Beverly Hills**   County: **Los Angeles**

State: **California**   Zip: **90212**

C. Telephone Number: **(310) 385-9300**   Fax Number: **(310) 385-9333**

Email Address: **DRS@SMGSB.COM**
CCMAIL/Internet etc.,

D. If the Applicant has branch offices in other Cities please indicate the 3 largest by Gross Billings:

| City: | City: | City: |
|---|---|---|
| State: Billings % | State: Billings % | State: Billings % |

E. Date Commenced Business: **28** **02** **1998**
Day   Month   Year

**000001**

F. Gross Billings (Including collected contingencies) by Fiscal Year:

This Year: $13,000,000.00     Last Year: $11,500,000.00     Two Years ago: $12,000,000.00

For 12 months ending: ___31___ ___12___ ___2014___
                          Day      Month     Year

G. Total number of Lawyers:

This Year [ 12 ]     Last Year [ 11 ]     Two Years ago [ 10 ]

H. Total number of:

Partners/ Shareholders [ 7 ]     Employed Lawyers/ Associates [ 5 ]     Of Counsel [ 0 ]     Other Staff [ 16 ]

I. For any contract Lawyers not listed in H and Employed by the Applicant in the past 12 months please indicate:

Number of Lawyers Employed [   ]     Billable hours worked [   ]     Amount Billable for their Services: $ _____

Comments: _____

---

**ADDITIONAL SUPPLEMENTS**

**2.** A. **Please complete Supplement Number 1 and attach a copy of the Applicant's letterhead.**

B. **Does the Applicant currently, or did the Applicant at any time:**

(i) in the last Ten years provide Legal Services to any Financial Institution as defined in the instructions for Supplement Number 2 ?     [ ] Yes  [ X ] No

**If yes, please complete Supplement Number 2.**

(ii) in the last Two years perform any Securities work ?     [ ] Yes  [ X ] No

**If yes, please complete Supplement Number 3.**

(iii) in the last Five years have any one Client or group of related Accounts produced more than 10% of Total Gross Billings?     [ ] Yes  [ X ] No

**If yes, please complete Supplement Number 4.**

(iv) in the last 12 months performed any Entertainment work?     [ X ] Yes  [ ] No

**If yes, please complete Supplement Number 5.**

(v) in the last Five years provide any other Professional Services apart from Legal work?     [ ] Yes  [ X ] No
If yes, please give details on a separate addendum. Please include details of applicable Insurance.

000002

**ACTIVITIES**

**2. C.** Indicate Percentage of this years "Total Gross Billings" derived from: (OVERALL TOTAL MUST EQUAL 100%)

For any area of law that represents more than 10% of the Applicants practice, complete any applicable detailed practice split

| AREA OF LAW | Last Year | This Year | Split 1 | Split 2 | Split 3 |
|---|---|---|---|---|---|
| Banking/Savings & Loan | % | % | | | |
| BI/PD & Personal Injury Litigation | % | % | Plaintiff Litigation % | Defense Litigation % | Plaintiff Class Actions % |
| General Corporate Advice/Litigation | % | % | Plaintiff Litigation % | Defense Litigation % | Advice/Other % |
| Corporate/Partnership Formation/Alteration | 2% | 2% | Corporate % | Partnership % | Mergers/Acquisitions % |
| Real Estate | % | % | Commercial Transactions % | Residential Transactions % | Litigation/Other % |
| Securities Practice including Syndication's/Bonds/Tax Shelters/Ltd. Partnerships and Derivatives | % | % | Plaintiff Litigation % | Defense Litigation % | All Other Sec work % |
| Taxation | % | % | Personal % | Corporate % | International % |
| Environmental | % | % | Plaintiff Litigation % | Defense Litigation % | Compliance/Advice % |
| Bankruptcy | % | % | For Creditor % | For Debtor % | Court appointed Trustee % |
| Copyright/Patent | 10% | 10% | Plaintiff Litigation % | Defense Litigation % | Advice/Filings % |
| Estate/Trust/Probate | % | % | Estate planning % | Trust Administration % | Probate % |
| Municipal Law (Except bonds) | % | % | Defense Litigation % | Advice on Finance/Investments % | Other % |
| Domestic Relations | % | % | Contested Divorce % | Un-contested Divorce % | Other % |
| Admiralty law (Except Labor Relations) | % | % | Plaintiff Litigation % | Defense Litigation % | Contract Law/International Law % |
| Criminal | % | % | | | |
| Labor Relations | % | % | Management Representation % | Union/Labor Representation % | Other % |
| Entertainment | 88% | 88% | Including Money Management 0% | Ex Money Management 100% | Litigation 0% |
| Oil & Gas | % | % | Plaintiff Litigation % | Defense Litigation % | Contract/Other % |
| Other Please describe: | % | % | % | % | % |
| | % | % | % | % | % |
| Overal Total | 100% | 100% | | | |

3.  A.  Is the Applicant managed by a management committee ?

     ☐ Yes   ☒ No

    comments: _____

    If yes, how many Partners or Officers comprise the management committee: _____

    and how often has it met in the past 12 months ? _____

    comments: _____

B.  Does the Applicant employ a full time non Lawyer Administrator ?

     ☒ Yes   ☐ No

    comments: _____

C.  Does the Applicant use a peer review system to evaluate the performance of all practicing
Lawyers (including Partners) within the Firm ?

     ☒ Yes   ☐ No

    If yes, does this include periodic review of selected case files by a Partner not handling the case ?

     ☐ Yes   ☒ No

    comments:    Associates are reviewed regularly

---

## NEW BUSINESS

(Please insert an "X" in the appropriate box, or a "W" where the response represents the Applicant's written policy)

4.  A.  Are the new Clients and new matters subject to approval of the Applicant's management committee
or at least One Independent Partner or Officer other than the Lawyer proposing to
handle the case ?

     ☐ Yes   ☒ No

    comments: _____

B.  Does the approval process for new Clients include independent enquiries as to a Client's
creditworthiness and reputation for payment of legal or other bills ?

     ☐ Yes   ☒ No

    comments:  As we get paid a direct percentage of what the client is paid, creditworthiness is rarely an issue.
We always consider a client's reputation when deciding whether or not to represent them.

C.  Is information as to all new Clients made available on at least a weekly basis to all Partners
or Officers of the Applicant ?

     ☒ Yes   ☐ No

    comments: _____

D.  Is a Lawyer generating new business required to associate with a Partner or Officer with specific
expertise in the matter ?

     ☒ Yes   ☐ No

    comments:    We only take business in our area of expertise

E.  Does the Applicant have a written Policy with regard to accepting or not accepting a Client on
a case or transaction for which the Client has already been represented by one or more
predecessor Legal Counsel ?

     ☐ Yes   ☒ No

    If yes, please summarize: _____

---

## CONFLICTS

(Please insert an "X" in the appropriate box, or a "W" where the response represents the Applicant's written policy)

5.  A.  How does the Applicant maintain its conflict of interest system ?

    Oral/Memory  ☒  Index File  ☐  Computer  ☒  Other: _____

    comments: _____

B. Is the conflict search always completed prior to accepting a Client ?    [X] Yes    [ ] No

comments:

C. If not, are Clients accepted subject to that search and is this documented in an engagement letter ?    [ ] Yes    [ ] No

comments:

D. Does the system contain the following information ? (Please tick as appropriate)

| | | |
|---|---|---|
| Client Name | [X] | Previous Firms of lateral hires employed by the Applicant  [ ] |
| Opposing party | [X] | Names of Parties whose representations was declined  [ ] |
| Client Subsidiaries | [ ] | Names of any Entity in which the Applicant or any Lawyer |
| Client Principals | [X] | practicing with the Applicant holds an outside interest (including |
| Opposing Counsel | [ ] | but not limit to an Equity interest or option to purchase Equity |
| | | and/or a position as a Director/Officer/Partner/Employee).  [ ] |

comments:        No outside interests exist

E. Are all Lawyers in the Firm, regardless of practice area or geographical location:

(i) able to access all conflict data held by the Applicant in their conflict search ?    [X] Yes    [ ] No

(ii) required to access all conflict data held by the Applicant in their conflict search ?    [X] Yes    [ ] No

comments:

F. Does the Applicant have a Policy not to review any privileged or confidential Client information prior to an unqualified acceptance of a Client ?    [X] Yes    [ ] No

comments:

G. Are potential conflicts always referred to an independent conflict Partner or committee ?    [X] Yes    [ ] No

comments:        Any conflicts will be referred to one of the partners

H. Where representation is continued subject to conflict waivers does the Applicant have a written Policy requiring the waiver to clearly :

(i) show the conflicting parties the nature of the conflict ?    [X] Yes    [ ] No

(ii) show how it could affect the representation ?    [X] Yes    [ ] No

(iii) show how the Client was advised to consider consulting another Law Firm either about the conflict and/or the original matter prior to signing the waiver ?    [X] Yes    [ ] No

comments:

I. With the exception of positions held with Charitable Institutions in relation to pro-bono work, does the Applicant or any Lawyer practicing with the Applicant hold an outside interest in a **Client** (including but not limited to an Equity interest or option to purchase Equity or a position as a Director/Officer/Partner/Employee) ?    [ ] Yes    [X] No

**If yes, please complete Supplement Number 4.**

(Please insert an "X" in the appropriate box, or a "W" where the response represents the Applicant's written policy)

**6.  A.**  For what percentage of cases does the Applicant:

(i) when accepting a representation send an engagement letter which clearly shows the scope of Services to be performed and the terms and rates on which the matter will be billed ? ......... **100 %**

(ii) when declining a representation send a non engagement letter ? ......... **75 %**

(iii) when ceasing representation send a disengagement letter ? ......... **90 %**

(iv) incorporate a fee mediation/arbitration clause into the retainer/engagement letter ? ......... **100 %**

comments: _____

**B.**  When declining a case in which a critical deadline or statute date may apply, does the Applicant always:

(i) send a non engagement letter ?  <u>We have not had any situations like this.</u>  ☐ Yes  ☐ No

(ii) by certified mail ?  ☐ Yes  ☐ No

(iii) which clearly warns of the importance of immediately seeking alternative representation ?  ☐ Yes  ☐ No

(iv) and the risk of losing the chance to pursue the case if a time deadline is exceeded ?  ☐ Yes  ☐ No

---

### DOCKET AND CALENDAR

(Please insert an "X" in the appropriate box, or a "W" where the response represents the Applicant's written policy)

**7.  A.**  Does the Applicant maintain a central system for control of statute dates and other critical deadlines ?  ☒ Yes  ☐ No

comments: _____

**B.**  Is this central system used by all Lawyers in the Firm to control the critical statutory dates or deadlines applicable to their area of practice ?  ☒ Yes  ☐ No

If no, please **describe:** _____

**C.**  How many independent date controls are kept on each matter ?  ☐ 1  ☒ 2  ☐ 3 (or more, please state)

comments: _____

**D.**  Does the Applicant use a   Perpetual Calendar ☐   Tickler Type ☒   Computer ☒

Other (please describe) _____

**E.**  Is all incoming mail checked centrally for critical dates by the person(s) responsible for docket control before being distributed to the Lawyer(s) handling the matter ?  ☐ Yes  ☒ No

comments:  <u>Our engagement letter specifically waives our obligation to clients with respect to the expiration of critical dates. Nevertheless, each attorney is responsible for docketing critical dates in conjunction with with responsible party.</u>

**F.**  Please describe how the Applicant ensures that statutes of limitation periods entered are correct and currently applicable for a case and take into account differences according to jurisdiction, category of defendant, cause of action, etc.,  <u>These issues do not apply as our firm does not perform litigation.  All contract statutes of limitation are checked by the responsible attorney. Our engagement letter specifically waives our obligation to clients with respect to the expiration of critical dates and time periods.</u>

or, if the Applicant is divided into formal departments, to all Lawyers in the appropriate department ?

    Yes   **X** No

comments: Only to the lawyer handling the matter with confirmation to the person responbile for docket control

---

## TRAINING AND SUPERVISION

(Please insert an "X" in the appropriate box, or a "W" where the response represents the Applicant's written policy)

**8.**  A. Does the Applicant maintain a formal training program for new Lawyers with regard to office and Court procedures ?

    Yes   **X** No

comments:  No court cases.  Only 12 attorneys.

B. How many Lawyers have participated in formal continuing Legal Education programs of at least seven hours during the last year ?    **12**

comments:

C. Are all Associates under the direct supervision of a Partner or Officer ?

    **X** Yes   No

comments:

---

## MISCELLANEOUS

(Please insert an "X" in the appropriate box, or a "W" where the response represents the Applicant's written policy)

**9.**  A. Do suits for collection of fees have to be approved by the Applicant's management committee or by at least two Partners or Officers ?

    **X** Yes   No

comments:

B. What percentage of the Applicant's billings are more than 90 days overdue from the date the bill was sent out ?    less than 3 %

comments:

C. How many suits for collection of fees have been filed by the Applicant during the past two years ?

None

comments:

D. Please explain what the Applicant has done to reduce the number of fee related disputes with Clients ?

(i)    Monthly billing for all Clients  **X**    (ii) Retainers for all new Clients

(iii)    Reporting of overdue receivables to the management committee when they exceed a set $ amount due:

from any one Client        to any one Lawyer

(iv)    Other:  We receive written authorizations from many clients for direct payment of fees by agents and/or managers

E. Other than on contingent cases, what is the largest amount currently owed by a Client to the Firm for billed or unbilled time ?    $   18,374.00

**000007**

F. Can the Applicant confirm that no Lawyers listed in Supplement 1 have been disbarred, suspended, had sanctions awarded against them of over $20,000 or been put on probation by any State Bar, Judicial Body or Regulatory Agency?

X Yes ☐ No

If no, please give details below or on a separate addendum.

comments:

G. Does the Applicant have a written Policy requiring complaints (by either a Client or their Counsel) to be reviewed by a Partner other than the Lawyer about whom the complaint is made ?

☐ Yes X No

comments:  Only 7 partners and 5 associates

H. Are two signatures required for all withdrawals of funds from Custodial Accounts?

X Yes ☐ No

comments:  For amounts in excess of $500

I. Has the Applicant in last Ten years changed the name of the Applicant?

X Yes ☐ No

Merged with, acquired or been acquired by any other Firm or Organization?

☐ Yes X No

Increased or decreased in size (by total Lawyer count) by more than 20% in a single year?

X Yes ☐ No

Are any of the above currently pending or contemplated?

☐ Yes X No

If yes, please give full details below or on a separate addendum, including the date of the change(s)

See attached

---

**INSURANCE**

The term "after enquiry" is deemed to mean to the knowledge of any Owner, Partner, Shareholder, Associate, Employed Lawyer, of Counsel or Employee.

10. A. Has Insurance of the type for which the Applicant is now applying ever been declined, cancelled or had the renewal thereof refused to the Applicant?

☐ Yes X No

If yes, please give details below or on a separate addendum.

comments:

B. After enquiry, have any claims or suits been made in the last Ten years against the Applicant or any past or present Owners, Partners, Shareholders, Corporate Officers, Associates, Employed Lawyers, Contract Lawyers, Employees or its predecessors in business?

X Yes ☐ No

If yes, how many?        1

**If yes, please complete enclosed Supplement Number 6.**

comments:  Partner, Mitch Smelkinson, was named in a defamation suit in 2007.  No malpractice was alleged.

C. After enquiry, are any persons listed in Supplement 1 aware of any circumstances, allegations, tolling agreements or contentions as to any incident which may result in a claim being made against the Applicant or any of its past or present Owners, Partners, Shareholders, Corporate Officers, Associates, Employed lawyers, Contract Lawyers or Employees or its predecessors in business?

☐ Yes X No

If yes, how many?

**If yes, please complete enclosed Supplement Number 6.**

comments:

D. Have all Claims and circumstances requiring a report in questions 10B and 10C already been reported to and accepted by a current or past Insurer?

[X] Yes [ ] No

If no, please give full details below or on a separate addendum.

comments: _____

_____

11. Please give details of previous Insurance purchased in the last Five years by the Applicant or predecessor Firms.

| Carrier | Number of Lawyers | Limits each Claim/ Aggregate | Deductible | Paid Premiums | Coverage dates effective From | To |
|---|---|---|---|---|---|---|
| See Attached | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

12. Has any extended claims reporting period ("tail") coverage been purchased in the last 7 years?   [ ] Yes [X] No

If yes, please give details: _____

_____

13. Has the Applicant had continuous Professional Liability Insurance coverage for at least Five years?   [X] Yes [ ] No

If no, please give details: _____

_____

_____

_____

14. Is the Applicant's expiring coverage on a standard policy WITHOUT any endorsements restricting coverage?   [ ] Yes [X] No

comments:   Traction Media, LLC is excluded from coverage

_____

15. Is there any Prior Acts restriction or Retroactive date on the Applicant's expiring policy?   [X] Yes [ ] No

If yes, please state the Retroactive date:          /          /

Day          Month          Year

| Douglas R. Stone, P.C. | 27/2/1996 | | |
| Neil E. Meyer | 1/1/1998 | | |
| Richard M. Genow | 17/3/1997 | Nathaniel Hayes Robbins | 17/9/2012 |
| Mitch Smelkinson | 1/2/1999 | John Ingram | 13/3/2013 |
| Allison H. Binder | 22/8/2000 | Stacey Hewitt | 10/12/2012 |
| Chad M. Christopher | 31/5/2005 | Hannah K. Mulderink | 9/29/2014 |
| Matthew S. Rosen | 19/6/2006 | | |
| Aron H. Baumel | 1/10/2009 | | |

9 of 10
Lloyd'sAppSMG15

| Coverage Limits of Liability | | Self Insured Retention | |
|---|---|---|---|
| $ 5,000,000.00 | Any one Claim and in the Aggregate, including Costs and Expenses. | $ $25,000.00 or $50,000.00 | Each and every Claim, including Costs and Expenses. |

The Applicant declares and warrants that, after enquiry, to the best knowledge of all persons to be insured the statements set forth herein and in any attachments made hereto are true and no material facts have been suppressed omitted or misstated. Underwriters reserve the right to deny or rescind coverage on any Policy that is issued as a result of this Application if, in the statements set forth herein and in any attachments made hereto it is found that material information has been omitted, suppressed or misstated.

Underwriters also reserve the right to amend the terms, conditions and limitations, coverage of any Policy that is issued as a result of this application, if subsequent to the date of this application, but prior to the inception date of such policy, there are any material alterations to the information contained herein. In the event of such material alteration, as aforesaid, the Applicant agrees to give immediate written notice to Underwriters and such notice shall attach to and form part of this application.

Signing this application does not bind the Applicant or Underwriters to complete the Insurance, but it is agreed that the statements and particulars contained herein will be relied upon by Underwriters should a Policy be issued.

This application is signed on behalf of all Owners, Partners, Shareholders, Corporate Officers and Employees.

Douglas R. Stone, A Professional Corporation

By: _____

AUTHORIZED SIGNATURE OF APPLICANT
Must be a principal of the Applicant and a person at risk

_____ 1/12/15
Date

President/Partner
TITLE

February 28, 2015
Effective Date Requested for this Insurance

PLEASE MAKE CERTAIN ALL QUESTIONS ARE ANSWERED AND THAT ALL APPLICABLE SUPPLEMENTS ARE COMPLETED.
THIS APPLICATION WILL NOT BE PROCESSED UNLESS ALL QUESTIONS ON THIS APPLICATION AND APPLICABLE SUPPLEMENTS ARE ANSWERED.

000010

# LLOYD'S

### LLOYD'S OF LONDON

SUPPLEMENT  **1**

APPLICATION FOR

## LAWYERS PROFESSIONAL LIABILITY INSURANCE

"WITH CERTAIN UNDERWRITERS AT LLOYD'S"

### INDIVIDUALS FOR WHOM COVERAGE IS BEING SOUGHT

IN ACCORDANCE WITH QUESTION 1.H. PLEASE NAME ALL OWNERS, PRINCIPALS, PARTNERS, OFFICERS AND EMPLOYED LAWYERS:

NB: COVERAGE APPLIES ONLY TO WORK UNDERTAKEN FOR OR ON BEHALF OF THE APPLICANT FIRM.

| | Name | Title | Year Admitted to Bar | Year Joined Applicant | Previous Firm |
|---|---|---|---|---|---|
| 1. | Douglas R. Stone* | Partner | 1986 | 1996 | Mitchell, Silberberg & Knupp |
| 2. | Neil E. Meyer | Partner | 1986 | 1998 | Alexander, Nau, Lawrence, Labowitz & Meyer |
| 3. | Richard M. Genow | Partner | 1989 | 1997 | Hanson, Jacobson, Teller & Hoberman |
| 4. | Mitch Smelkinson | Partner | 1993 | 1999 | Alexander, Nau, Lawrence & Frumes |
| 5. | Allison H. Binder | Partner | 1997 | 2000 | Arnold & Porter |
| 6. | Chad M. Christopher | Partner | 2004 | 2005 | O'Melveny & Myers |
| 7. | Matthew S. Rosen | Partner | 2003 | 2006 | Business Affairs, Inc. |
| 8. | Aron H. Baumel | Associate | 2003 | 2009 | William Morris Agency/WME |
| 9. | Nathaniel H. Robbins | Associate | 2005 | 2012 | Morgan, Lewis & Bockius LLP |
| 10. | Ingram, John R. | Associate | 2005 | 2013 | Davis, Shapiro, Lewit & Hayes, LLP |
| 11. | Hewitt, Stacey | Associate | 2012 | 2012 | Law Offices of Elsa Ramo |
| 12. | Mulderink, Hannah K. | Associate | 2007 | 2014 | Lionsgate |
| 13. | | | | | |
| 14. | *A Professional Corporation | | | | |
| 15. | | | | | |
| 16. | | | | | |
| 17. | | | | | |
| 18. | | | | | |
| 19. | | | | | |
| 20. | | | | | |
| 21. | | | | | |
| 22. | | | | | |
| 23. | | | | | |
| 24. | | | | | |
| 25. | | | | | |
| 26. | | | | | |
| 27. | | | | | |
| 28. | | | | | |

**000011**

| | Name | Title | Year Admitted to Bar | Year Joined Applicant | Previous Firm |
|---|---|---|---|---|---|
| 29. | | | | | |
| 30. | | | | | |
| 31. | | | | | |
| 32. | | | | | |
| 33. | | | | | |
| 34. | | | | | |
| 35. | | | | | |
| 36. | | | | | |
| 37. | | | | | |
| 38. | | | | | |
| 39. | | | | | |
| 40. | | | | | |
| 41. | | | | | |
| 42 | | | | | |
| 43. | | | | | |
| 44. | | | | | |
| 45. | | | | | |
| 46 | | | | | |
| 47. | | | | | |
| 48. | | | | | |
| 49. | | | | | |
| 50. | | | | | |
| 51. | | | | | |
| 52. | | | | | |
| 53. | | | | | |
| 54. | | | | | |
| 55. | | | | | |
| 56. | | | | | |
| 57. | | | | | |
| 58. | | | | | |
| 59. | | | | | |

I UNDERSTAND THE INFORMATION SUBMITTED HEREIN BECOMES PART OF THE APPLICANT'S LAWYERS PROFESSIONAL LIABILITY APPLICATION AND IS SUBJECT TO THE SAME REPRESENTATIONS AND CONDITIONS.

Douglas R. Stone, A Professional Corporation

By: _____                          President/Partner _____
AUTHORIZED SIGNATURE OF APPLICANT                    TITLE

_____ 1/12/15 _____
Date

000012



Douglas R. Stone
drs@smgsb.com

STONE, MEYER, GENOW, SMELKINSON & BINDER, LLP
9665 WILSHIRE BLVD. FIFTH FLR. BEVERLY HILLS, CA 90212
TELEPHONE: 310.385.9300  FACSIMILE: 310.385.9333
ATTORNEYS AT LAW

000013

**STONE, MEYER, GENOW, SMELKINSON & BINDER, LLP – Professional Liability Insurance History**

| Company | Policy Number | Insurer | # of Attys | Aggregate Limit | Deductible | Premium | Policy Inception & Expiration Dates |
|---|---|---|---|---|---|---|---|
| Stone, Meyer, Genow, Smelkinson & Binder, LLP | 302/SF100578D | Lloyds of London and various other companies | 9 | $5,000,000 | $50,000 | $107,780 | 2/28/10 – 2/27/11 |
| Stone, Meyer, Genow, Smelkinson & Binder, LLP | 302/SF110578E | Lloyds of London and various other companies | 10 | $5,000,000 | $50,000 | $107,000 | 2/28/11 – 2/27/12 |
| Stone, Meyer, Genow, Smelkinson & Binder, LLP | BINDER604246 | Lloyds of London and various other companies | 10 | $5,000,000 | $50,000 | $112,750 | 2/28/12 – 2/27/13 |
| Stone, Meyer, Genow, Smelkinson & Binder, LLP | B1150SF132548G | Lloyds of London and various other companies | 11 | $5,000,000 | $50,000 | $122,500 | 2/28/13 – 2/27/14 |
| Stone, Meyer, Genow, Smelkinson & Binder, LLP | B0621PSTO00814 | Lloyds of London and various other companies | 11 | $5,000,000 | $50,000 | $122,500 | 2/28/14 – 2/27/15 |

Month/Day/Year

ProfLiabLloyds5yr

000014

# STONE, MEYER, GENOW, SMELKINSON & BINDER, LLP
### Details Regarding Changes in Firm Name and Number of Attorneys

Douglas R. Stone, A Professional Corporation changed its name to Stone, & Company, A Professional Corporation when Richard M. Genow was hired as an associate in March of 1997. Effective February 28, 1998, Stone & Company, A Professional Corporation merged with Neil E. Meyer to form Stone & Meyer, LLP. Stone & Company, A professional Corporation changed its name back to Douglas R. Stone, A Professional Corporation and became one of two partners (together with Neil E. Meyer, individually) in Stone & Meyer, LLP. In January of 1999, Richard M. Genow became a partner and the name of the firm was changed shortly thereafter to Stone, Meyer & Genow, LLP. Mitch Smelkinson joined the firm as an associate in 1999, and became a partner in 2001, but the name of the firm was not changed. Allison H. Binder joined the firm as an associate in 2000 and became a partner in January of 2004. Again, the name of the firm was not changed. Erin McPherson joined the firm as an associate in April of 2002, and Mark J. Wetzstein joined the firm as an associate in June of 2003, but left the firm in 2005. In May of 2005, Thomas Zadra and Chad Christopher joined the firm as associates. On January 1, 2006, the name of the firm was changed to Stone, Meyer, Genow, Smelkinson & Binder, LLP. In June of 2006, Matthew Rosen joined the firm as an associate, and in January of 2007, Erin McPherson and Thomas Zadra left the firm. In May of 2008, Melanie Kessler joined the firm as an associate, and in July of 2008, Chad Christopher became a partner. Melanie Kessler left the firm in May of 2010. In August of 2010, Mark Johnson joined the firm as an associate, and on January 1, 2011, Matthew Rosen became a partner. In July of 2011, Marc Von Arx joined the firm as an associate. In August of 2012, Mark Johnson left the firm, and in September of 2012, Nathaniel H. Robbins joined the firm as an associate. In March of 2013, John Ingram joined the firm as an associate, and Stacey Hewitt was promoted to associate in September of 2013. Marc Von Arx left the firm in October of 2013. On September 29, 2014, Hannah Mulderink joined the firm as an associate. As of January 1, 2015, Stone, Meyer, Genow, Smelkinson & Binder, LLP has seven partners and five associates.


# Traction Media, LLC

In May of 2002, the four then partners of Stone, Meyer & Genow, LLP started a film sales and consulting company called Traction Media, LLC. The then partners of Stone, Meyer & Genow, LLP became partners in Traction Media, LLC (Doug Stone as an individual, not through his professional corporation) along with Rosanne Korenberg, but Rosanne Korenberg left Traction Media, LLC in August of 2006. Traction Media, LLC is run as a completely separate business from Stone, Meyer, Genow, Smelkinson & Binder, LLP with its own employees, books and bank accounts. Development executive, Maren Olson, and her assistant are currently Traction's only full-time employees.

SMGHistory

**000015**

# LLOYD'S

### LLOYD'S OF LONDON

SUPPLEMENT 5

APPLICATION FOR
## LAWYERS PROFESSIONAL LIABILITY INSURANCE
### "WITH CERTAIN UNDERWRITERS AT LLOYD'S"
#### ENTERTAINMENT

1. Please attach a list of your "ENTERTAINMENT" CLIENTS.

2. Please indicate the percentage of the Applicant's entertainment work derived from:

   Film **50%**   TV **50%**   Music ____ %   Sports ____ %   Other ____ %

3. Where the Applicant has represented a combination of two or more of the following in a transaction:

   Artist/Player
   Agent/Manager
   Record Company/Studio/Team
   Producer
   Lenders/Investors

   Does the firm obtain and hold on file signed conflict waivers from all parties?   [ X ] Yes  [   ] No

   If Yes, for how long has this Policy been in force **1/1/1996** and when was the last

   transaction for which no signed conflict waivers were obtained?   **Never**

4. Does the Firm perform any money management or Investment advice on behalf of its Entertainment Clients?   [   ] Yes  [ X ] No

   If Yes, please give details:

   _____
   _____

5. Does the firm ever bill fees based on a percentage of an Entertainment client's income?

   If so, at what rate? **5-10** %

6. Please briefly describe the Services rendered for Entertainment Clients:

   General business advising and counseling, negotiation and documentation of employment and other related
   agreements, production legal work on motion picture and television productions
   _____
   _____
   _____
   _____

Douglas R. Stone, A Professional Corporation

By: _____   President/Partner
AUTHORIZED SIGNATURE OF APPLICANT   TITLE

Date **1/12/15**

**000016**



SUPPLEMENT **6**

## LLOYD'S OF LONDON

APPLICATION FOR

### LAWYERS PROFESSIONAL LIABILITY INSURANCE

"WITH CERTAIN UNDERWRITERS AT LLOYD'S"

**CLAIM FORM**

**APPLICANT'S INSTRUCTIONS**

**A.** THIS FORM IS TO BE COMPLETED IF THE APPLICANT OR ANY LAWYER NAMED IN SUPPLEMENT 1 IS CURRENTLY OR HAS BEEN INVOLVED IN ANY CLAIM OR SUIT DURING THE LAST TEN YEARS AS INDICATED BY A "YES" ANSWER TO QUESTIONS 10B OR 10C. PLEASE COMPLETE ONE FORM FOR EACH CLAIM.

**B.** IF SPACE IS INSUFFICIENT TO ANSWER ANY QUESTION FULLY, PLEASE USE SEPARATE ADDENDUM. DO NOT ATTACH COPIES OF SUMMONS AND COMPLAINT.

**C.** PLEASE NOTE THIS SUPPLEMENT IS FOR UNDERWRITING INFORMATION AND DOES NOT CONSTITUTE NOTICE OF CLAIM. IF YOU WISH TO NOTIFY A CLAIM ON YOUR CURRENT OR EXPIRING POLICY PLEASE CHECK THE CLAIMS PROVISIONS OF YOUR POLICY AND/OR SEEK ADVICE FROM YOUR BROKER.

**D.** PLEASE LEAVE NO BLANKS.

1. Full Name of individual(s) and name of firm involved in the claim:

   A. Mitch Smelkinson

   B. _____

   C. _____

2. Additional Defendants:

   A. Julie O'Hora

   B. Zach Tann

   C. _____

   D. _____

3. Full Name of claimant: Seven Arts Pictures, Inc.

4. Date of alleged error: N/A - Defamation Claim

5. To what Insurance Company did you report this claim: Lloyd's of London

6. Date reported to Insurance Company: October 29, 2007

7. From which Area of Law as described in Question 2C Activities, did the claim or circumstance arise?
   Entertainment - Defamation

**000017**

| OPEN CLAIM | | CLOSED CLAIM | |
|---|---|---|---|
| Circumstance/Claim ☐ | In Suit ☐ | Closed without payment ☒ | Closed with payment ☐ |

**Amounts Outstanding**

Amount asked in summons: _____

Claimant's settlement demand: $ _____

Defendant's offer for settlement: $ _____

Defense costs to date: _____

Insurers Current Loss reserve: $ _____

**Amounts Paid**

Defense costs Paid by Applicant: $ _____

Defense costs Paid by Insurer: $ _____

Damages/Settlement Paid by Applicant: $ _____

Damages/Settlement Paid by Insurer: $ _____

Date of Settlement: _____

9. (Please provide enough information to allow an evaluation - DO NOT ATTACH SUMMONS AND COMPLAINT)

A. Please describe the Services rendered and how they relate to the Parties in this matter:

Mitch Smelkinson, transactional attorney for writer, Julie O'Hora, negotiated and documented a screenplay option/purchase agreement on her behalf with Pool Boy The Movie, LLC, assignor of claimant.

B. Describe plaintiff's allegation/Applicant's response and evaluation:

Plaintiff alleges that Smelkinson defamed it by claiming that it did not have the right to distribute the film (which is based on O'Hora's screenplay) since the purchase price was not paid. Smelkinson made such claim solely to plaintiff and to an attorney, Philip Rosen, in discussing a possible settlement.

C. Value of the case or transaction to your Client: $ N/A        Trial Date: ___/___/___
                                                                    Day  Month  Year

D. Applicant's evaluation of value of this claim:     Est Loss          $ _____
                                                      Est Defense Costs  $ _____

Current Case Status: Mitch Smelkinson was named in the suit but never served. The claim was dismissed on December 19, 2007, pursuant to Anti-SLAPP motion, subject to appeal until February 20, 2008. An Appeal was filed, but Mitch Smelkinson was not named in the appeal. The claim has since been dismissed.

E. Please explain what has been done to avoid a recurrence of this type of claim:

N/A

I UNDERSTAND THE INFORMATION SUBMITTED HEREIN BECOMES PART OF THE APPLICANT'S PROFESSIONAL LIABILITY APPLICATION AND IS SUBJECT TO THE SAME REPRESENTATIONS AND CONDITIONS AND THAT THERE WILL BE NO COVERAGE AFFORDED UNDER THE PROPOSED INSURANCE FOR ANY MATTER(S) LISTED IN RESPONSE TO THIS SUPPLEMENT

Douglas R. Stone, A Professional Corporation

By: _____        President /Partner

Date  1/12/15

# EXHIBIT 2



**IRONSHORE SPECIALTY INSURANCE COMPANY**
Mailing Address:
75 Federal Street
5th Floor
Boston, MA 02110
Toll Free: (877) IRON411

**NOTICE:**

**1. THE INSURANCE POLICY THAT YOU (HAVE PURCHASED) (ARE APPLYING TO PURCHASE) IS BEING ISSUED BY AN INSURER THAT IS NOT LICENSED BY THE STATE OF CALIFORNIA. THESE COMPANIES ARE CALLED "NONADMITTED" OR "SURPLUS LINE" INSURERS.**
**2. THE INSURER IS NOT SUBJECT TO THE FINANCIAL SOLVENCY REGULATION AND ENFORCEMENT THAT APPLY TO CALIFORNIA LICENSED INSURERS.**
**3. THE INSURER DOES NOT PARTICIPATE IN ANY OF THE INSURANCE GUARANTEE FUNDS CREATED BY CALIFORNIA LAW. THEREFORE, THESE FUNDS WILL NOT PAY YOUR CLAIMS OR PROTECT YOUR ASSETS IF THE INSURER BECOMES INSOLVENT AND IS UNABLE TO MAKE PAYMENTS AS PROMISED.**
**4. THE INSURER SHOULD BE LICENSED EITHER AS A FOREIGN INSURER IN ANOTHER STATE IN THE UNITED STATES OR AS A NON-UNITED STATES (ALIEN) INSURER. YOU SHOULD ASK QUESTIONS OF YOUR INSURANCE AGENT, BROKER, OR "SURPLUS LINE" BROKER OR CONTACT THE CALIFORNIA DEPARTMENT OF INSURANCE AT THE FOLLOWING TOLL-FREE TELEPHONE NUMBER: 800-927-4357. ASK WHETHER OR NOT THE INSURER IS LICENSED AS A FOREIGN OR NON-UNITED STATES (ALIEN) INSURER AND FOR ADDITIONAL INFORMATION ABOUT THE INSURER. YOU MAY ALSO CONTACT THE NAIC'S INTERNET WEB SITE AT WWW.NAIC.ORG.**
**5. FOREIGN INSURERS SHOULD BE LICENSED BY A STATE IN THE UNITED STATES AND YOU MAY CONTACT THAT STATE'S DEPARTMENT OF INSURANCE TO OBTAIN MORE INFORMATION ABOUT THAT INSURER.**
**6. FOR NON-UNITED STATES (ALIEN) INSURERS, THE INSURER SHOULD BE LICENSED BY A COUNTRY OUTSIDE OF THE UNITED STATES AND SHOULD BE ON THE NAIC'S INTERNATIONAL INSURERS DEPARTMENT (IID) LISTING OF APPROVED NONADMITTED NON-UNITED STATES INSURERS. ASK YOUR AGENT, BROKER, OR "SURPLUS LINE" BROKER TO OBTAIN MORE INFORMATION ABOUT THAT INSURER.**
**7. CALIFORNIA MAINTAINS A LIST OF APPROVED SURPLUS LINE INSURERS. ASK YOUR AGENT OR BROKER IF THE INSURER IS ON THAT LIST, OR VIEW THAT LIST AT THE WEB SITE OF THE CALIFORNIA DEPARTMENT OF INSURANCE: WWW.INSURANCE.CA.GOV.**
**8. IF YOU, AS THE APPLICANT, REQUIRED THAT THE INSURANCE POLICY YOU HAVE PURCHASED BE BOUND IMMEDIATELY, EITHER BECAUSE EXISTING COVERAGE WAS GOING TO LAPSE WITHIN TWO BUSINESS DAYS OR BECAUSE YOU WERE REQUIRED TO HAVE COVERAGE WITHIN TWO BUSINESS DAYS, AND YOU DID NOT RECEIVE THIS**

000001

**DISCLOSURE FORM AND A REQUEST FOR YOUR SIGNATURE UNTIL AFTER COVERAGE BECAME EFFECTIVE, YOU HAVE THE RIGHT TO CANCEL THIS POLICY WITHIN FIVE DAYS OF RECEIVING THIS DISCLOSURE. IF YOU CANCEL COVERAGE, THE PREMIUM WILL BE PRORATED AND ANY BROKER'S FEE CHARGED FOR THIS INSURANCE WILL BE RETURNED TO YOU.**
**Date: _____**
**Insured: _____**

000002



**IRONSHORE SPECIALTY INSURANCE COMPANY**

Mailing Address:
75 Federal Street
5th Floor
Boston, MA  02110
Toll Free: (877) IRON411

**Policy #:** 002311800
**Expiring Policy #:** N/A

THIS IS ISSUED BY THE INSURANCE COMPANY SELECTED ABOVE

# LAWYERS PROFESSIONAL LIABILITY POLICY

**WITH CLAIM EXPENSES INCLUDED IN THE LIMIT OF LIABILITY**

# DECLARATIONS

**This is a Claims Made and Reported Policy, please read it carefully.  Amounts incurred as Claim Expenses shall reduce the limit of liability available to pay judgments or settlements and shall also be applied against the deductible.**

| ITEM 1. NAMED INSURED AND PRINCIPAL ADDRESS: | Item 2. POLICY PERIOD |
|---|---|
| Stone, Meyer, Genow, Smelkinson & Binder, LLP<br>9665 Wilshire Blvd., 5th Floor<br>Beverly Hills, CA  90212 | **(a) Inception Date:  February 28, 2015**<br><br>**(b) Expiration Date:  February 28, 2016**<br><br>at 12:01 a.m. both dates at the Principal |

**ITEM 3. LIMIT OF LIABILITY** (inclusive of **Claim Expenses**)

$5,000,000 Each Claim

$5,000,000 aggregate limit of liability for all Claims made or deemed made during Policy Period

**ITEM 4. DEDUCTIBLE:**

$50,000

**000003**

**ITEM 5. PREMIUM**

**Premium:**

*Compliance with all surplus lines placement requirements, including stamping the Policy and collection and payment of surplus lines taxes, is the responsibility of the broker.*

Premium:          $122,500.00
----------------------        ----------------
Total Amount Due:   $122,500.00

*See Invoice for the date Premium is due and payable.  Failure to pay the premium in full may result in voidance of coverage.*

**ITEM 6. RETROACTIVE DATE:** Full Prior Acts

**ITEM 7. FORMS AND ENDORSEMENTS ATTACHED AT ISSUANCE:**
LPL.COV.002 (0509) Lawyers Professional Liability Coverage Form

1. IRON.PN.001 (0513) OFAC Compliance Notice
2. IRON.END.ALL.005 (0212) Reliance Upon Other Application
3. LPL.MANU.310 (0415)Defense And Settlement Of Claims Amended
4. LPL.MANU.156-10 (0415)Allocation Provision Deleted  (Section Vii., E.)

**ITEM 8.  INSURER**
**ADDRESS:**                    c/o Ironshore Insurance Services, LLC
One State Street Plaza
8th Floor
New York, NY 10004

**ITEM 9. BROKER:**
**ADDRESS:**

John DeRose
Hartan Brokerage, Inc.
33 West 60th Street, 6th Floor
New York, NY  10023

**THESE DECLARATIONS, TOGETHER WITH THE COMPLETED AND SIGNED APPLICATION, FOR THIS POLICY AND THE FOLLOWED POLICY, INCLUDING INFORMATION FURNISHED IN CONNECTION THEREWITH WHETHER DIRECTLY OR THROUGH PUBLIC FILING, AND THE POLICY FORM ATTACHED HERETO, CONSTITUTE THE INSURANCE POLICY.**

Date:  April 17, 2015
          MO/DAY/YR.                                                          Authorized Representative

000004

# CALIFORNIA CONSUMER SERVICES NOTICE

Your policy has been issued by:

**Ironshore Specialty Insurance Company**
**75 Federal Street**
**5th Floor**
**Boston, MA 02110**

If you are having problems, you can contact **Ironshore Specialty Insurance Company** at the following address and telephone number:

**75 Federal Street**
**5th Floor**
**Boston, MA 02110**
**(877) IRON-411**

**THE FOLLOWING ADDRESS AND TOLL-FREE TELEPHONE NUMBER ARE AVAILABLE FOR YOUR USE IN THE EVENT A SATISFACTORY SOLUTION CANNOT BE OBTAINED FROM YOUR INSURANCE AGENT OR COMPANY REGARDING ANY PROBLEMS YOU MAY EXPERIENCE:**

**THE DEPARTMENT OF INSURANCE**
**CONSUMER SERVICES**
**300 SOUTH SPRING STREET**
**LOS ANGELES, CA  90013**
**1-800-927-HELP**

**000005**



## IRONSHORE SPECIALTY INSURANCE COMPANY

Mailing Address:
75 Federal Street
5th Floor
Boston, MA  02110
Toll Free: (877) IRON411

**THIS IS A CLAIMS MADE AND REPORTED POLICY**
**WITH CLAIM EXPENSES INCLUDED IN THE LIMIT OF LIABILITY**
**PLEASE READ THE ENTIRE POLICY CAREFULLY**

# LAWYERS PROFESSIONAL LIABILITY POLICY

**Insured Name:** Stone, Meyer, Genow, Smelkinson & Binder, LLP
**Policy Number:** 002311800

In consideration of the payment of the premium and in reliance upon all statements made and information furnished to the **Insurer** shown in the Declarations, including the statements made in the **Application**, and subject to all terms, conditions and limitations of this Policy, the **Insured** and **Insurer** agree:

**Section I.**          **Insuring Agreements**

**A.**     The **Insurer** shall pay on behalf of each **Insured** all sums the **Insured** shall become legally obligated to pay as **Damages** as a result of a **Claim** first made against the **Insured** during the **Policy Period** and reported to the **Insurer** during the **Policy Period** and arising out of the rendering of or failure to render **Professional Legal Services.**

**B.**     The **Insurer** shall have the right and duty to defend any **Claim** first made against the **Insured** during the **Policy Period** and reported to the **Insurer** during the **Policy Period** and arising out of the rendering of or failure to render **Professional Legal Services,** including an appeal thereof, seeking **Damages** to which this insurance applies even if any of the allegations are groundless, false, or fraudulent. The **Insurer** shall have the right to appoint defense counsel and to make any investigation it deems necessary and, with the written consent of the **Insured,** settle any **Claim** covered by the terms of this Policy.  If the **Insured** shall refuse to consent to any settlement or compromise recommended by the **Insurer** and acceptable to the claimant and shall elect to contest the **Claim,** then the liability of the **Insurer** under this Policy shall not exceed the amount for which the **Insurer** would have been liable for **Damages** and **Claim Expenses** if the **Claim** had been settled or compromised, when and as so recommended.  The **Insurer** shall have no liability for **Claim Expenses** incurred thereafter and shall have the right to withdraw from further investigation or defense of the **Claim** by tendering control of such investigation or defense to the **Insured,** and the **Insured** agrees, as a condition of the issuance of this Policy, to accept such tender.

**C.**     The **Insurer** shall have neither the right nor the duty to defend a **Disciplinary Proceeding**.  In the event the violation of disciplinary rules or other professional misconduct alleged in a **Disciplinary Proceeding** is not proven by a final and enforceable determination by a tribunal of competent jurisdiction adverse to the **Insured** and is not admitted by the **Insured,** then the **Insurer** shall reimburse the **Insured** for reasonable fees, costs and expenses incurred by an **Insured** to a limit of twenty-five thousand dollars ($25,000) for each **Insured,** subject to an aggregate limit of one hundred thousand dollars ($100,000) for all **Disciplinary Proceedings** during the **Policy Period** and reported to the **Insurer** pursuant to **Section VIII** of the Policy.

000006

These amounts shall be in excess of the **Limit of Liability** and no Deductible will apply in connection with a **Disciplinary Proceeding**.

**Section II.**      **Definitions**

A.      "**Application**" shall mean each and every signed application submitted to the **Insurer** for consideration of insurance together with any attachments to such applications, other material submitted therewith or incorporated therein, and any other documents submitted in connection with the underwriting of this Policy.

B.      "**Bodily Injury**" shall mean physical injury, sickness, disease or death of any person.

C.      "**Claim**" shall mean a demand received by an **Insured** for money or services, including the service of suit or institution of arbitration proceedings against the **Insured**.

D.      "**Claim Expenses**" shall mean fees charged by any lawyer designated by the **Insurer** and all other fees, costs and expenses resulting from the investigation, adjustment, defense and appeal of a **Claim**, if incurred by the **Insurer**.  However, **Claim Expenses** do not include salary charges of regular employees or officials of the **Insurer** or any fees, costs or expenses of any **Insured**.  **Claim Expenses** shall include the reasonable costs of attendance by an **Insured**, at the request of the **Insurer,** at a trial or a court imposed hearing or arbitration proceeding, such reasonable costs not to exceed five hundred dollars ($500) for each **Insured** for each day of attendance, subject to an aggregate amount of fifty thousand dollars ($50,000) for all **Claims** during the **Policy Period** and reported to the **Insurer** pursuant to **Section VIII** of the Policy.

E.      "**Damages**" shall mean a monetary judgment or settlement, including any such judgment or settlement for **Personal Injury**, but does not include fines or statutory penalties, sanctions, whether imposed by law or otherwise, any amount awarded in a **Disciplinary Proceeding**, any amount for which the **Insured** is not financially liable or that is without legal recourse to the **Insured** or matters that may be deemed uninsurable under law.

F.      "**Disciplinary Proceeding**" shall mean a proceeding alleging violation of any disciplinary rule or other professional misconduct brought before a tribunal of competent jurisdiction that shall make a determination, subject to appeal or other review and/or a final and enforceable determination, as to whether such alleged professional misconduct is to be the subject of discipline.

G.      "**Domestic Partner**" shall mean any natural person qualifying as a domestic partner under the provisions of any applicable federal, state or local law or under the provisions of any formal program established by the **Named Insured**.

H.      "**Insured**" shall mean:

(1)      the **Named Insured**;

(2)      if the **Named Insured** is an individual, such individual;

(3)      if the **Named Insured** is a partnership or limited liability partnership, such partnership or limited partnership and each lawyer who is a partner thereof including any incorporated partner and each shareholder or any such incorporated partner;

(4)      if the **Named Insured** is a professional corporation, professional association or limited liability corporation, such professional corporation, professional association or limited liability corporation and each lawyer who is a shareholder or member thereof;

(5)      each lawyer employed by the **Named Insured**;

000007

**(6)** any person who previously qualified or who during the **Policy Period** qualifies as an **Insured** under 2, 3, 4 or 5 above, but only to extent such person performs or has performed **Professional Legal Services** on behalf of the **Named Insured**;

**(7)** each lawyer acting as "of counsel" but only while performing **Professional Legal Services** on behalf of the **Named Insured**;

**(8)** any lawyer who is acting as an independent contractor or on a per diem basis for the **Named Insured**, but only while acting within the scope of their **Professional Legal Services** on behalf of the **Named Insured**;

**(9)** all non lawyer employees who were, are now or become employees of the **Named Insured**, but only while acting within the scope of their employment by the **Named Insured**; and

**(10)** the estate, heirs, executors, administrators, assigns and legal representatives of each **Insured** in the event of the death, incapacity, insolvency or bankruptcy such an **Insured**, but only to the extent that such **Insured** would otherwise be provided coverage under this Policy.

**I.** **"Insurer"** shall mean the Insurer stated in Item 8 of the Declarations.

**J.** **"Named Insured"** shall mean the person or entity designated in Item 1 of the Declarations and any **predecessor** of such entity.  For purposes of this definition, **"predecessor"** means any individual or entity engaged in the practice of law whose financial assets and liabilities the **Named Insured** is the majority successor in interest.

**K.** **"Personal Injury"** shall mean:

**(1)** False arrest, detention or imprisonment;
**(2)** Malicious prosecution;
**(3)** Libel or slander or other defamatory or disparaging materials;
**(4)** Publication or an utterance in violation  of an individual's right to privacy;
**(5)** Wrongful entry or eviction, or other invasion of the right to private occupancy; and
**(6)** mental anguish, mental injury, shock, humiliation, emotional distress or fright, if arising out of **(1)** through **(5)** above.

**L.** **"Policy Period"** shall mean the period from the inception date of this Policy to the expiration date of this Policy as set forth in Item 2 of the Declarations, or its earlier termination if applicable.  The expiration date of this Policy shall be extended to the next business day if the expiration date otherwise falls on a Saturday, Sunday or legal holiday.

**M.** **"Professional Legal Services"** shall mean legal services and activities performed for others as a lawyer, and including pro bono legal services, services as a notary public, arbitrator, mediator, title insurance agent, designated issuing lawyer to a title insurance company, fiduciary, services rendered as a member of a bar association, ethics, peer review, formal accreditation board or similar professional boards or committees, or the publication or presentation of research papers or similar materials by an **Insured** but only if the fees generated from such publication or presentation are not greater then thirty thousand dollars ($30,000).  **Professional Legal Services** shall include services as an administrator, conservator, receiver, executor, guardian, or in any similar fiduciary capacity, or trustee, if such services are usual and customary to the practice of law and are in the rendering of professional services to others in an attorney client relationship.

**N.** **"Property Damage"** shall mean injury to or destruction of any tangible property or loss of the use resulting therefrom.  Tangible property does not include currency and negotiable instruments.

000008

**O.** "**Related Professional Legal Services**" shall mean **Professional Legal Services** that are the same, related or continuous, or **Professional Legal Services** that arise from a common nucleus of facts.  **Claims** can allege **Related Professional Legal Services** regardless of whether such **Claims** involve the same or different claimants, **Insureds** or legal causes of action.

**P.** "**Totally and permanently disabled**" shall mean that an **Insured** has become so disabled as to be wholly prevented from rendering **Professional Legal Services** provided that such disability:

**(1)** has existed continuously for not less than 6 months, and

**(2)** is expected to be continuous and permanent.

"**Totally and permanently disabled**" shall not include any condition that is a result of war or acts of war, whether or not declared, occurred during active service in the armed forces of any country or results from intentionally self-inflicted injuries, attempted suicide, whether or not sane or the abuse or misuse of addictive chemical compounds or alcohol.

**Section III.      Exclusions**

The **Insurer** shall not be liable to make any payments in connection with any **Claim** made against any **Insured**:

**A.** alleging, arising out of, based upon or attributable to:

**(1)** an **Insured** gaining any profit, advantage or remuneration to which they were not legally entitled; provided, however, this exclusion shall only apply when it is finally adjudicated that such conduct occurred;

**(2)** the deliberately fraudulent or criminal acts of an **Insured**; provided, however, this exclusion shall only apply when it is finally adjudicated that such conduct occurred; or

**(3)** **Professional Legal Services** for a trust or estate if the **Insured** is or becomes a beneficiary or distributee of such trust or estate.

**B.** alleging, arising out of, based upon or attributable to any **Professional Legal Services** or **Related Professional Legal Services** or any fact, circumstance or situation that has been the subject of any notice or **Claim** given under any other policy of which this Policy is a renewal or replacement;

**C.** alleging, arising out of, based upon or attributable to any pending or prior civil, criminal, administrative or investigative proceeding involving the **Insured** as of the effective date of the first Lawyers Professional Liability Policy issued by the **Insurer** to the **Insured** or any **Professional Legal Services** or **Related Professional Legal Services** or any fact, circumstance or situation underlying or alleged in such proceedings;

**D**. alleging, arising out of, based upon or attributable to **Professional Legal Services** prior to the Retroactive Date stated in Item 6 of the Declarations and any subsequent **Related Professional Legal Services**;

**E.** alleging, arising out of, based upon or attributable to **Professional Legal Services** if an **Insured**, prior to the effective date of the first Lawyers Professional Liability Policy issued by the **Insurer** to the **Insured,** had knowledge of the circumstances that gave rise to the **Claim** and reason to believe that a **Claim** might result;

**F.** for any actual or alleged **Bodily Injury**, **Property Damage,** mental anguish or emotional distress arising from such **Bodily Injury** or **Property Damage,** except this exclusion shall not apply to mental anguish or emotional distress arising from **Personal Injury**;

000009

**G.**      for any **Professional Legal Services** of an **Insured** in connection with any pension or welfare plan of the **Insured** or of any other entity, including, without limitation, any **Claim** against an **Insured** for a violation of the duties, obligations, and responsibilities under the Employee Retirement Income Security Act of 1974, any rules or regulations thereunder or amendments thereto, except this exclusion shall not apply if an **Insured** is deemed to be a fiduciary solely by reason of **Professional Legal Services** rendered with respect to an employee benefit plan or if an **Insured** is appointed as a receiver, trustee or custodian of an employee benefit plan by a court;

**H.**      that is brought by or on behalf of the **Named Insured** or by or on behalf of any **Insured,** unless the **Claim** arises from an attorney/client relationship;

**I.**      alleging, arising out of, based upon or attributable to legal services or other act, error or omission by an **Insured** in any capacity with an entity other than the **Named Insured**;

**J.**      alleging, arising out of, based upon or attributable to any act, error or omission as an officer, director, partner, trustee or employee of a corporation, partnership, association, trust or fund, including a pension, welfare, profit sharing, mutual or investment fund or trust, or any other entity, business enterprise or charitable organization of any kind or nature other than that of the **Named Insured**, except this exclusion shall not apply if an **Insured** is appointed as a receiver, trustee or custodian of an employee benefit plan by a court;

**K.**      alleging, arising out of, based upon or attributable to services as a public officer, or an employee of a governmental body, subdivision, or agency;

**L.**      alleging, arising out of, based upon or attributable to the alleged certification or acknowledgement by an **Insured** in the capacity as a notary public of a signature on a document which the **Insured** did not personally witness being placed on the document;

**M.**      alleging, arising out of, based upon or attributable to the conversion, misappropriation, improper commingling of client funds, the return of or restitution, or disgorgement of fees, costs and expenses, or other amounts, or arising out of the rendering or failing to render investment advice;

**N.**      alleging, arising out of, based upon or attributable to **Professional Legal Services** by an **Insured** with respect to any entity if the **Insured** is an employee of the entity or controls, operates or manages the entity, either individually or in a fiduciary capacity, or if the **Insured** and/or members of the immediate family of the **Insured** own 10% or more of the issued and outstanding shares, units or other portions of the capital of the entity;

**O.**      alleging, arising out of, based upon or attributable to services as a title insurance agent where there is alleged to be a defect in title of which an **Insured** had actual knowledge as of the date of issuance of the title insurance policy or any actual or alleged breach of underwriting authority by an **Insured**.


**Section IV.          Waiver of Exclusion (Innocent Insured) and Breach of Conditions**

If coverage under this Policy would be excluded or lost because of **Section III. Exclusions**, subsection **A. (2)** relating to a judgment or final adjudication alleging, arising out of, based upon or attributable to any deliberately fraudulent or criminal acts by an **Insured**, or because of noncompliance with **Section VIII. Notice of Claim**, relating to the giving of notice to the **Insurer,** with respect to which an **Insured** shall be in default solely because of the default or concealment of such default by one or more other **Insured** responsible for the loss or damage otherwise insured hereunder, the **Insurer** agrees that such insurance as would otherwise be afforded under this Policy shall apply with respect to each and every **Insured** who did not personally commit or personally participate in committing one or more of the acts described in either such exclusion or such condition.  If the condition is one with which such **Insured** can comply after receiving knowledge thereof, the **Insured** entitled to the benefit of the **Waiver of Exclusion and Breach of Conditions** shall comply with such condition promptly after obtaining

000010

knowledge of the failure of any **Insured** to comply therewith.  The obligation of the **Insurer** to pay in the event of such waiver shall be excess of the Deductible and

excess of the full extent of any assets in the **Named Insured**, or monetary value attributed to such assets, of any **Insured** who is not a beneficiary of the waiver.


**Section V.**          **Limit of Liability**

    **A.**     The **Insurer** shall be liable to pay **Damages** and **Claim Expenses** in excess of the applicable Deductible amount stated in Item 4 of the Declarations up to the Each Claim Limit of Liability stated in Item 3 of the Declarations.

    **B.**     The liability of the **Insurer** for all **Damages** and **Claim Expenses** arising from any and all **Claims** first made and reported pursuant to **Section VIII** of this Policy shall be the amount stated in Item 3 of the Declarations as the Aggregate Limit of Liability which shall be the maximum aggregate Limit of Liability of the **Insurer** for the **Policy Period** and Discovery Period, if applicable, regardless of the time of payment or the number of **Claims**.

    **C.**     **Claim Expenses** shall be part of, and not in addition to, the Limit of Liability stated in Item 3 of the Declarations.  Such **Claim Expenses** shall serve to reduce the Limit of Liability.

    **D.**     More than one **Claim** involving the same **Professional Legal Services** or **Related Professional Legal Services** of one or more **Insureds** shall be considered a single **Claim**, subject to the Each Claim Limit of Liability stated in Item 3 of the Declarations and only one Deductible shall be applicable to such single **Claim**.  All such **Claims** constituting a single **Claim** shall be deemed to have been made on the earlier of the following date: **(1)** the earliest date on which any such **Claim** was first made; or **(2)** the earliest date on which any such **Professional Legal Services** or **Related Professional Legal Services** were reported under this Policy or any other policy providing similar coverage.

    **E.**     If two or more policies of Lawyers Professional Liability Insurance issued by the **Insurer** apply to the same **Claim** for which the **Insured** is jointly and severally liable, the **Insurer** shall not be liable under this Policy for a greater proportion of such **Damages** and **Claim Expenses** than the liability of the **Insurer** under this Policy bears to the total liability of the **Insurer** under all applicable valid and collectible insurance issued by the **Insurer**.  Provided, the **Insurer** shall not be obligated to pay any sum that exceeds the Limit of Liability of the Policy issued by the **Insurer** that has the highest applicable Limit of Liability.


**Section VI.**          **Deductible**

    **A.**     The Deductible shall apply to all **Damages** and **Claim Expenses**.  One Deductible shall apply to **Damages** and **Claim Expenses** arising from each **Claim** alleging the same **Professional Legal Services** or **Related Professional Legal Services**.

    **B.**     The Deductible shall be paid by the **Insured** as a condition precedent to payment of any **Damages** or **Claim Expenses** by the **Insurer**.  Defense counsel assigned to defend a **Claim** may request payment of the Deductible.  The **Insured** is required to remit the Deductible to defense counsel as may be requested by defense counsel.  The Deductible shall be paid by the **Insured** for each and every **Claim** within thirty (30) days of written demand by the **Insurer**.  The determination of the **Insurer** as to the reasonableness of the **Claim Expenses** shall be conclusive on the **Insured**.

    **C.**     If the **Insured** agrees to the mediation of a **Claim** and such mediation results in a settlement of the **Claim** that is consented to by the **Insurer,** one-half of the Deductible shall not be payable by the **Insured** in connection with such **Claim**.


**Section VII.**          **Costs of Defense and Settlements**

000011

A.  The **Insured** shall not incur any fees, costs or expenses, or admit liability, offer to settle, or agree to any settlement in connection with any **Claim** without the express prior written consent of the **Insurer**, which consent shall not be unreasonably withheld.  The **Insured** shall provide the **Insurer** with all information and particulars it may reasonably request in order to reach a decision as to such consent.  **Damages** resulting from an admission of liability, agreement to settle, or any fees, costs or expenses incurred prior to the consent of the **Insurer**, shall not be insured by this Policy.

B.  Notwithstanding **Section VII. A**. above, if all **Insureds** are able to settle all **Claims** that are subject to an applicable Deductible for an amount that, together with the **Claim Expenses**, does not exceed the applicable Deductible, the **Insured** may agree to such a settlement without the prior written consent of the **Insurer**.

C.  The **Insured** shall cooperate with the **Insurer** and provide the **Insurer** such information as it may reasonably require in the investigation, defense or settlement of any **Claim**.

D.  All **Claim Expenses** shall be first subtracted from the applicable Limit of Liability with the remainder, if any, being the amount available to pay **Damages**.  If the Limit of Liability is exhausted prior to settlement or judgment of any pending **Claim**, the **Insurer** shall have the right to withdraw from the further investigation or defense thereof by tendering control of such investigation or defense to the **Insured**, and the **Insured** agrees, as a condition to the issuance of this Policy, to accept such tender.

E.  If a **Claim** made against an **Insured** includes both covered and uncovered matters, the **Insured** and the **Insurer** recognize that there must be an allocation between covered and uncovered **Damages** and **Claim Expenses**.  The **Insured** and the **Insurer** shall use their best efforts to agree upon a fair and proper allocation between covered and uncovered **Damages** and **Claim Expenses**, taking into account the relative legal and financial exposures and the relative benefits obtained by each **Insured** as a result of the covered and uncovered matters and/or such benefits to an uninsured party using the same measure.  If the **Insured** and the **Insurer** are not able to agree regarding the amount of the allocation, the **Insurer** shall pay only those amounts, excess of the applicable Deductible, that the **Insurer** deems to be fair and equitable until a different amount shall be agreed upon or determined pursuant to the provisions of this Policy and the above standards.

**Section VIII.    Notice of Claim**

A.  The **Insured** shall, as a condition precedent to their rights under this Policy, give the **Insurer** notice in writing of any **Claim** that is made during the **Policy Period**.  In the event suit is brought against an **Insured**, the **Insured** shall immediately forward to the **Insurer** every demand, notice, summons, complaints or other process received directly by the **Insured** or by a representative of the **Insured**.  Such notice shall be given as soon as practicable but in no event later than thirty (30) days after the end of the **Policy Period.**  If notice is provided pursuant to this Section, any **Claim** subsequently made against an **Insured** and reported to the **Insurer** alleging, arising out of, based upon or attributable to the prior noticed **Claim** or alleging the same **Professional Legal Services** or **Related Professional Legal Services**, shall be considered related to the prior **Claim** and made at the time notice of the prior **Claim** was first provided.

B.  If during the **Policy Period** or during the Discovery Period (if applicable) the **Insured** shall become aware of any circumstances that may reasonably be expected to give rise to a **Claim** being made against an **Insured** and shall give written notice to the **Insurer** of the circumstances, the **Professional Legal Services** allegations anticipated and the reasons for anticipating such a **Claim** with full particulars as to dates, persons and entities involved, then a **Claim** that is subsequently made against such **Insured** and reported to the **Insurer** alleging, arising out of, based upon or attributable to such circumstances or alleging any **Related Professional Legal Services**, shall be considered made at the time notice of such circumstances was given.  Notice of any such subsequent **Claim** shall be given to the **Insurer** as soon as practicable.

000012

**C.**     In addition to furnishing the notice as provided in **Section VIII**, the **Insured** shall, as soon as practicable, furnish the **Insurer** with copies of reports, investigations, pleadings and other papers in connection therewith.

**D.**     Notice to the **Insurer** as provided in **Section VIII** shall be given in writing and to the **Insurer** in and to the address stated in Item 8 of the Declarations.

**Section IX.**     **Discovery Period**

**A.**     **Automatic Discovery Period**

If the **Named Insured** or the **Insurer** shall cancel or refuse to renew this Policy and the **Named Insured** has not obtained another policy of Lawyers Professional Liability Insurance within sixty (60) days of the termination of this Policy, then the **Insurer** shall extend the insurance afforded by this Policy, subject otherwise to its terms and conditions, to apply to a **Claim** first made against the **Insured** and reported to the **Insurer** during the sixty (60) days immediately following the effective date of such non renewal or cancellation, but only by reason of **Professional Legal Services** before such effective date and otherwise covered by this Policy.

**B.**     **Optional Discovery Period**

If the **Named Insured** or the **Insurer** shall cancel or refuse to renew this Policy, then the **Named Insured**, upon payment of additional premium as set forth herein, shall have the option to extend the insurance afforded by this Policy to apply to a **Claim** first made against the **Insured** and reported to the **Insurer**, during (1) 12 months, (2) 24 months, (3) 36 months, (4) 60 months, (5) an unlimited period, as elected by the **Named Insured**, immediately following the effective date of such non renewal or cancellation, but only by reason of **Professional Legal Services** before such effective date and otherwise covered by this Policy.  The extension of coverage for a **Claim** first made after the non-renewal or cancellation of this Policy shall be endorsed hereto, if purchased, and shall hereinafter be referred to as the "Optional Discovery Period".

**C.**     **Individual Attorney Discovery Period**

If any **Insured**, except those under **Section II. Definitions, "Insured"**, sub-section 7, 8 and 9, shall retire or otherwise cease the private practice of law during the **Policy Period**, then such **Insured**, upon payment of an additional premium set forth herein, shall have the option to extend the insurance afforded by this Policy to apply to a **Claim** first made against such **Insured** and reported to the **Insurer** during (1) 12 months, (2) 24 months, (3) 36 months, (4) 60 months, or (5) an unlimited period, as elected by such **Insured**, but only by reason of **Professional Legal Services** committed or alleged to have been committed by such **Insured** before the date such **Insured** retired or terminated the private practice of law.

**D.**     **Discovery Period Conditions**

**(1)**     The premium for a Discovery Period, if elected, shall be (1) 100% for 12 months, (2) 150% for 24 months, (3) 180% for 36 months, (4) 200% for 60 months, (5) 250% for an unlimited period, of the full annual premium for this Policy stated in the Declarations.  The premium for an Individual Attorney Discovery Period shall be the per attorney rated premium of the above stated percentages.

**(2)**     The entire premium for a Discovery Period shall be deemed fully earned at inception of the Discovery Period.  In the event the **Insured** terminates a Discovery Period before its expiration for any reason, the **Insurer** shall not be liable to return any portion of the premium for the Discovery Period.

000013

(3)     The fact that the period during which a **Claim** must be first made against the **Insured** under this Policy is extended by virtue of a Discovery Period shall not in any way increase the Limit of Liability of this Policy. The Deductible provisions of this Policy will apply with respect to a **Claim** first made against the **Insured** during a Discovery Period.

(4)     As a condition precedent to the right to elect a Discovery Period, any and all premiums and Deductibles that are due must have been paid and all other terms and conditions of this Policy must have been complied with.  An Individual Attorney Discovery Period is not available to any **Insured** when the license or right to practice the profession of such **Insured** is revoked, suspended or surrendered.

(5)     The right of the **Named Insured** to elect a Discovery Period must be exercised in writing not later then sixty (60) days after the effective date of the non renewal or cancellation of this Policy. Such election of a Discovery Period must indicate the total extension period desired and must include payment of the premium for such Discovery Period.  If such conditions precedent are not satisfied on the effective date of the non renewal or cancellation of this Policy or if the election is not timely made, an **Insured** shall not at a later date be able to exercise such right.

(6)     The right of an **Insured** to elect an Individual Attorney Discovery Period must be exercised in writing not later then sixty (60) days after the **Insured** shall retire or otherwise cease the private practice of law**.** Such election of an Individual Attorney Discovery Period must indicate the total extension period desired and must include payment of the premium for such Individual Attorney Discovery Period.  If such conditions precedent are not satisfied or if the election is not timely made, an **Insured** shall not at a later date be able to exercise such right.

(7)     If, during the Policy Period, (a) an **Insured** shall die, except by suicide, (b) an **Insured** who was the sole proprietor, partner (including the shareholder or an incorporated partner), shareholder, member or employed lawyer of the **Named Insured** shall become **totally and permanently disabled**, or (c) an **Insured** who was a sole proprietor, partner (including the shareholder or an incorporated partner), shareholder, member or employed lawyer of the **Named Insured** with three consecutive full years of coverage by the **Insurer** shall retire or otherwise cease the private practice of law, such **Insured** shall be entitled to an Individual Attorney Discovery Period at no additional premium.

(8)     The Individual Attorney Discovery Period shall not apply if there is other insurance in effect on or after the date the **Insured** retired or terminated the practice of law that covers the **Insured** for such **Professional Legal Services.**  Such other insurance shall render this Individual Attorney Discovery Period inapplicable, even though the limit of liability of such other insurance may be inadequate to pay all losses and claim expenses and/or the deductible amount and retention provisions of such other insurance may be different from those of this Policy.

(9)     The Limit of Liability applicable to an Optional Extended Reporting Period or an Individual Attorney Discovery Period is an aggregate Limit of Liability, part of and not in addition to the Limit of Liability stated in the Declarations, for the applicable period for any and all **Insureds** electing an Optional Extended Reporting Period or an Individual Attorney Discovery Period and is not a Limit of Liability for each **Insured**.

## Section X.     General Conditions

### A.     Cancellation or Non-Renewal

(1)     This Policy may be cancelled by the **Named Insured** at any time by surrender thereof to the **Insurer** or by written notice to the **Insurer**.  Upon cancellation, the **Insurer** shall retain the customary short rate portion of the premium.

000014

**(2)**   This Policy may be cancelled by the **Insurer** by mailing to the **Named Insured** written notice stating when, not less than thirty (30) days thereafter, such cancellation shall be effective. However if the **Insurer** cancels this Policy because the **Insured** has failed to pay the premium or Deductible when due, this Policy may be cancelled by the **Insurer** by mailing a written notice of cancellation to the **Named Insured** stating when, not less than ten (10) days thereafter, such cancellation shall be effective. Such notice shall be conclusive on all **Insureds**. Any such notice of cancellation and any other notice to be provided by the **Insurer** to the **Named Insured** or any **Insured** hereunder shall be mailed to the **Named Insured** at its address set forth in the Declarations. If cancelled by the **Insurer**, earned premium shall be computed pro rata. Premium adjustment may be made at the time cancellation is effective or as soon as practicable thereafter.

**(3)**   If the **Insurer** elects not to renew this Policy, the **Insurer** shall provide the **Named Insured** with no less than sixty (60) days advance notice thereof.

**(4)**   The mailing of notice as aforementioned shall be sufficient notice and the effective date of cancellation stated in any notice shall become the end of the **Policy Period**. Delivery of such written notice by the **Named Insured** or the **Insurer** shall be the equivalent of mailing.

**B.**   Application

It is agreed by the **Insured** that the particulars and statements contained in the **Application** and any information provided therewith (which shall be on file with the **Insurer** and be deemed attached hereto as if physically attached hereto) are the basis of this Policy and are to be considered as incorporated in and constituting a part of this Policy. It is further agreed by the **Insured** that the statements in the **Application** or in any information provided therewith are their representations, that they are material and that this Policy is issued in reliance upon the truth of such representations.

**C.**   Other Insurance

Subject to **Section V. E.**, the insurance afforded by this Policy shall only apply as excess over any other valid policy or policies, whether such other policy or policies are stated to be primary, contributory, excess, contingent or otherwise.

**D.**   Action Against the Insurer

**(1)**   No action shall be taken against the **Insurer** unless, as a condition precedent thereto, there shall have been full compliance with all the terms of this Policy, and until the obligation of the **Insured** to pay shall have been finally determined by an adjudication against the **Insured** or by written agreement of the **Insured**, claimant and the **Insurer**.

**(2)**   No person or organization shall have any right under this Policy to join the **Insurer** as a party to any **Claim** against an **Insured** nor shall the **Insurer** be impleaded by an **Insured** or their legal representative in any such **Claim.**

**E.**   Coverage Extensions

**(1)**   Lawful Spouse or Domestic Partner Provision.

The coverage provided by this Policy shall also apply to the lawful spouse or **Domestic Partner** of an **Insured**, but only for a **Claim** arising out of any actual or alleged **Professional Legal Services** of such **Insured**.

**(2)**   Worldwide Provision

The coverage provided under this Policy shall apply worldwide.

000015

**(3)** Estates and Legal Representatives

The coverage provided by this Policy shall apply to the estates, heirs, legal representatives or assigns of any **Insured** in the event of their death, incapacity or bankruptcy, but only for **Claims** arising out of any actual or alleged **Professional Legal Services** of any **Insured**.

**F.** Subrogation

In the event of any payment under this Policy, the **Insurer** shall be subrogated to all of the rights of recovery of the **Insured** and the **Insured** shall execute all papers required and shall do everything that may be necessary to secure such rights, including the execution of such documents as may be necessary to enable the **Insurer** to effectively bring suit in the name of any **Insured**.

**G.** Dispute Resolution

In the event any dispute arises in connection with this Policy that cannot be resolved, the **Insurer** and the **Insured** shall participate in a non-binding mediation in which the **Insurer** and the **Insured** shall attempt in good faith to resolve such dispute. Either the **Insured** or the **Insurer** shall have the right to commence a judicial proceeding or, if the parties agree, a binding arbitration, to resolve such dispute. However, no judicial proceeding or arbitration shall be commenced until termination of the mediation and until at least ninety (90) days has passed from the termination of the mediation. Each party will bear its own legal fees and expenses. The costs and expenses of a mediation, or any arbitration, shall be split equally by the parties.

**H.** The warranties, terms, conditions, exclusions and limitations of this Policy are to be construed in an even handed fashion between the **Insured** and the **Insurer**. Without limitation, where the language of this Policy is deemed to be ambiguous or otherwise unclear, the issues shall be resolved in the manner most consistent with the warranties, terms, conditions, exclusions and limitations viewed as a whole without regard to authorship of the language and without any presumption or arbitrary interpretation or construction in favor of either the **Insured** or the **Insurer**.

**I.** Assignment

Assignment of interest under this Policy shall not bind the **Insurer** until its consent is endorsed hereon.

**J.** Named Insured Changes

If during the Policy Period the total lawyer population of the **Named Insured** is changed by 50% or more, the **Named Insured** shall notify the **Insurer** within sixty (60) days of such change. In the event of a merger, dissolution or acquisition, the **Named Insured** will notify the **Insurer** within thirty (30) days of the projected date of such merger, dissolution or acquisition. In the event of a change in the lawyer population of the **Named Insured** or a merger, dissolution or acquisition, the **Insurer** shall have the right to accept or decline the continuation of coverage and to charge an additional premium. This provision shall not apply to a **Named Insured** that had less than six (6) lawyers at the inception of this Policy.

**K.** Conformity to Statute

Any terms of this Policy that are in conflict with the terms of any applicable laws are hereby amended to conform to such laws.

**L.** Entire Agreement

By acceptance of this Policy, the **Insured** and the **Insurer** agree that this Policy (including the Declarations, **Application** submitted to the **Insurer** and any information provided therewith) and any written

000016

endorsements attached hereto constitute the entire agreement between the parties.  The terms, conditions and limitations of this Policy can be waived or changed only by written endorsement.

**M.**     Named Insured Represents Insured

By acceptance of this Policy, the **Named Insured** signatory shall be designated to act on behalf of all **Insureds** for all purposes including, but not limited to, the giving and receiving of all notices, consents and correspondence, the cancellation or non-renewal of this Policy, the payment of premiums, and the receipt of any return premiums that may be due under this Policy.

**N.**     Representative of the Insurer

Ironshore Insurance Services, LLC, One State Street Plaza, 8th Floor, New York, NY 10004 shall act on behalf of the **Insurer** for all purposes including, but not limited to, the giving and receiving of all notices and correspondence, provided, however, notice of **Claim** shall be given pursuant to **Section VIII** of the Policy.

**O.**     Service of Suit

In the event of the failure of the **Insurer** to pay any amount claimed to be due hereunder, the **Insurer**, at the request of the **Insured**, will submit to the jurisdiction of any court of competent jurisdiction within the United States.  Nothing in this condition constitutes or shall be understood to constitute a waiver of the right of the **Insurer** to commence an action in any court of competent jurisdiction within the United States, to remove an action to a United States District Court or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States. Service of process in any such suit may be made upon Ironshore Insurance Services, LLC, One State Street Plaza, 8th Floor, New York, NY 10004.  In any suit instituted against the **Insurer** upon this Policy the **Insurer** will abide by the final decision of such court or of any appellate court in the event of any appeal. Pursuant to any statute of any state, territory or district of the United States that makes provision therefore, the **Insurer** hereby designates the Superintendent, Commissioner or Director of Insurance, or other officer specified for that purpose in the statute, or his or her successor or successors in office, as its true and lawful attorney upon whom may be served lawful process in any action, suit or proceeding instituted by or on behalf of the **Insured** or any beneficiary hereunder arising out of this Policy, and hereby designates the above named Ironshore Insurance Services, LLC, One State Street Plaza, 8th Floor, New York, NY 10004 as the entity to whom said office is authorized to mail such process or true copy thereof.

**P.**     Bankruptcy

Bankruptcy or insolvency of the **Insured** shall not relieve the **Insurer** of any of its obligations under this policy.

**Q.**     Headings

The descriptions in the headings of this Policy form no part of the terms and conditions of the coverage under this Policy.

Ironshore Specialty Insurance Company by:

Secretary                                                      President

000017



**IRONSHORE SPECIALTY INSURANCE COMPANY**

Mailing Address:
75 Federal Street
5th Floor
Boston, MA  02110
Toll Free: (877) IRON411

**Endorsement #** 1

**Policy Number:** 002311800                                    **Effective Date of Endorsement:** February 28, 2015
**Insured Name:**  Stone, Meyer, Genow, Smelkinson & Binder, LLP

# OFAC COMPLIANCE NOTICE

Payment of Loss under this Policy shall only be made in full compliance with all United States of America economic or trade sanction laws or regulations, including, but not limited to, sanctions, laws and regulations administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC").

**000018**



## IRONSHORE SPECIALTY INSURANCE COMPANY

Mailing Address:

75 Federal Street

5th Floor

Boston, MA  02110

Toll Free: (877) IRON411

**Endorsement #** 2

**Policy Number:** 002311800                                      **Effective Date of Endorsement:** February 28, 2015

**Insured Name:**  Stone, Meyer, Genow, Smelkinson & Binder, LLP

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# RELIANCE UPON OTHER APPLICATION

In consideration of the Premium charged, it is understood and agreed that the **Insurer** has relied upon the statements and representations contained in the below referenced application (including materials submitted thereto and, if such application is a renewal application, all such previous policy applications, and their attachments and materials, for which this Policy is a renewal or succeeds in time) as being accurate and complete. It is further understood and agreed that the **Insured** warrants and represents to the **Insurer** that the statements and representations made in the below referenced application were accurate on the Date Signed and that the **Insured** hereby reaffirms each and every statement made in the below referenced application as accurate as of Date Signed as if it was made to the **Insurer** on such date. All such statements and representations shall be deemed to be material to the risk assumed by the **Insurer**, are the basis of this Policy and are to be considered as incorporated into this Policy.

| **TYPE OF POLICY APPLICATION** | **INSURER** | **DATE SIGNED** |
|---|---|---|
| Lawyers Professional Liability | Lloyd's Of London | 01/12/15 |

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.

_____                          April 17, 2015

Authorized Representative                                                    Date

**000019**



## IRONSHORE SPECIALTY INSURANCE COMPANY
Mailing Address:
75 Federal Street
5th Floor
Boston, MA  02110
Toll Free: (877) IRON411

**Endorsement #** 3

**Policy Number:** 002311800                    **Effective Date of Endorsement:** February 28, 2015
**Insured Name:**  Stone, Meyer, Genow, Smelkinson & Binder, LLP

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# DEFENSE AND SETTLEMENT OF CLAIMS AMENDED

It is hereby understood and agreed that Section I. Insuring Agreements B. is deleted in its entirety and is replaced by:

**B.** The **Insurer** shall have the right and duty to defend any **Claim** first made against the **Insured** during the **Policy Period** and reported to the **Insurer** during the **Policy Period** and arising out of the rendering of or failure to render **Professional Legal Services**, including an appeal thereof, seeking **Damages** to which this insurance applies even if any of the allegations are groundless, false, or fraudulent. The **Insurer** shall have the right to appoint defense counsel and to make any investigation it deems necessary and, with the written consent of the **Insured**, settle any **Claim** covered by the terms of this Policy.  If the **Insured** shall refuse to consent to any settlement or compromise recommended by the **Insurer** and acceptable to the claimant and shall elect to contest the **Claim**, then the liability of the **Insurer** under this Policy shall not exceed:

(1)    the amount for which the **Claim** could have been settled;
(2)    the costs and expenses incurred with the consent of the **Insurer** up to the date of such refusal;
(3)    plus fifty percent (50%) of the **Claim Expenses** and **Damages** incurred with the consent of the **Insurer** subsequent to the date of such refusal, up to a maximum limit of $1,000,000.

The failure of the **Insured** to express consent to a settlement recommended by the **Insurer** will be deemed refusal to consent to the settlement.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.

_____                    April 17, 2015
Authorized Representative                                      Date

**000020**



## IRONSHORE SPECIALTY INSURANCE COMPANY

Mailing Address:
75 Federal Street
5th Floor
Boston, MA  02110
Toll Free: (877) IRON411

**Endorsement #** 4

**Policy Number:** 002311800                                    **Effective Date of Endorsement:** February 28, 2015
**Insured Name:**  Stone, Meyer, Genow, Smelkinson & Binder, LLP

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ALLOCATION PROVISION DELETED  (SECTION VII., E.)

It is hereby understood and agreed that Section VII. Costs of Defense and Settlements, E. is deleted in its entirety.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.

_____                          April 17, 2015
Authorized Representative                                               Date

**000021**

# EXHIBIT 3

1   JEFFREY A. LIPOW (SBN 82339)
    **LIPOW & HARRIS**
2   18801 Ventura Boulevard, Suite 208
    Tarzana, California 91356
3   Telephone: (818) 905-0507

4   KEVIN SALUTE, (SBN 173366)
    **SALUTE LAW**
5   18801 Ventura Boulevard, Suite 208
    Tarzana, California 91356
6   Telephone:  (818) 981-7373

7   Attorneys for Plaintiff
    JANE DOE

8

9

10

11

**FILED**
Superior Court of California
County of Los Angeles

APR 1 0 2015

Sherri R. Carter, Executive Officer/Clerk
By _Cristina Grijalva_ Deputy
Cristina Grijalva

D37 Marc Marmaro

### SUPERIOR COURT OF THE STATE OF CALIFORNIA

### FOR THE COUNTY OF LOS ANGELES

12  JANE DOE,

13          Plaintiff,

14  vs.

15

16  NEIL ETTIN MEYER, individually; STONE,
17  MEYER, GENOW, SMELKINSON, AND
    BINDER LLP, a California limited liability
18  partnership; and DOES 1 through 100,
    inclusive,

19
            Defendants.
20

**CASE NO.:  BC 5 7 8 3 7 0**

**COMPLAINT FOR DAMAGES FOR (1)
INTENTIONAL INFLICTION OF
EMOTIONAL DISTRESS; (2) BREACH
OF FIDUCIARY DUTY, AND; (3)
SEXUAL HARASSMENT IN VIOLATION
OF CIVIL CODE SECTION 51.9**

21
22      Plaintiff JANE DOE ("Plaintiff") on behalf of herself and no one else alleges as
    follows:
23
24                          **JURISDICTION AND VENUE**
        1.      This Court has jurisdiction over this action pursuant to California Constitution
25
    Article VI, section 10, which grants the Superior Court "original jurisdiction in all causes
26
    except those given by statute to other courts."  The statutes under which this action is
27
    brought do not specify any other basis for jurisdiction.
28
        2.      This Court has jurisdiction over all Defendants because, upon information

-1-
COMPLAINT FOR DAMAGES

000001

1  and belief, each party is either a citizen of California, has sufficient minimum contacts in
2  California, or otherwise intentionally avails itself of the California market so as to render
3  the exercise of jurisdiction over it by the California courts consistent with traditional
4  notions of fair play and substantial justice.

5      3.      Venue is proper in this Court because, upon information and belief, the
6  named Defendants reside, transact business, and/or have offices located in this County
7  and the acts and omissions alleged herein took place in this County.  In addition, the
8  named Plaintiff herein resides in the County of Los Angeles and was employed by the
9  Defendants in the County of Los Angeles.

10                                    **PARTIES**

11      4.      Plaintiff is an individual residing in the County of Los Angeles, State of
12  California.  Plaintiff sues under a fictitious name due to her being the victim of sexual
13  assault, battery, and rape over a period of years as alleged herein.

14
15      5.      Plaintiff is informed and believes and thereon alleges that Defendant NEIL
16  ETTIN MEYER (hereafter "MEYER") is an individual residing in the State of California in
17  the County of Los Angeles.  Plaintiff is further informed and believes and thereon alleges
18  that MEYER is and at all times mentioned herein was an attorney duly licensed to practice
19  law in the State of California.

20      6.      Plaintiff is informed and believes and thereon alleges that Defendant
21  STONE, MEYER, GENOW, SMELKINSON & BENDER LLP (hereafter "STONE MEYER")
22  is a limited liability partnership formed and existing under the laws of the State of
23
24  California. Plaintiff is informed and believes and thereon alleges that STONE MEYER is a
25  law firm having its principal place of business at 9665 Wilshire Blvd., Suite 500, Beverly
26  Hills, California.  Plaintiff is further informed and believes and thereon alleges that MEYER
27  is and at all times mentioned herein was a principal, shareholder, officer, managing agent,
28  and/or director of STONE MEYER.

-2-
COMPLAINT FOR DAMAGES

000002

7.    The true names and capacities, whether corporate, associate, individual or otherwise, of defendants Does 1 through 100, inclusive, are unknown to Plaintiff who sues said defendants by such fictitious names. Plaintiff is informed and believe, and based on that information and belief allege, that each of the defendants designated as a Doe is legally responsible for the events and happenings referred to in this complaint, and unlawfully caused the injuries and damages to Plaintiffs alleged in this Complaint. Plaintiffs will seek leave of court to amend this Complaint to show the true names and capacities when the same have been ascertained. For purposes of this Complaint, MEYER, STONE MEYER, and Does 1 through 100 will hereinafter collectively be referred to as "Defendants".

8.    Plaintiff is informed and believes, and thereon alleges, that at all times material herein the defendants, and each of them, were the agents, servants, and employees, or ostensible agents, servants, or employees of each other defendant, and as such, were acting within the course and scope of said agency and employment or ostensible agency and employment, except on those occasions when defendants were acting as principals, in which case, said defendants, and each of them, were negligent in the selection, hiring, and use of the other defendants.

9.    Each defendant principal and/or employer herein had advance knowledge of the unfitness of each defendant agent and/or employee, and employed each such agent and/or employee with a conscious disregard of the rights or safety of others or otherwise authorized or ratified the wrongful conduct of each such agent and/or employee.  As to each such corporate or other entity defendant herein, the advance knowledge and conscious disregard, authorization, ratification, or act of oppression, fraud, or malice was on the part of an officer, director, or managing agent of the corporation or other entity.

10.    Plaintiff is further informed and believes that at all times relevant hereto, defendants, and each of them, acted in concert and in furtherance of the interests of each other defendant.

000003

## **FACTUAL ALLEGATIONS**

11.    At all times herein relevant, MEYER and STONE MEYER held themselves out to be prominent, high-powered Hollywood entertainment attorneys, representing "A-List" entertainers.

12.    During her freshman year in college, Plaintiff was encouraged to enter beauty pageants, ultimately becoming a teen beauty pageant winner.  Thereafter she was contacted by a theatrical manager about pursuing acting.

13.    In or about 1997, Plaintiff moved to California to pursue an acting career. In or about 2002, Plaintiff obtained her first leading role in a feature film and her manager advised that she obtain an attorney as part of her team.

14.    Plaintiff's manager introduced her to MEYER whom he highly recommended as an entertainment attorney.   MEYER was introduced to Plaintiff as a high-powered Hollywood dealmaker, who was capable of maximizing deals for Plaintiff.  MEYER himself informed Plaintiff that he represented several "A-List" entertainers, and would be able to promote Plaintiff's career.

15.    From approximately 2002 to 2015, MEYER and STONE MEYER were at all times attorneys for Plaintiff, and an attorney-client relationship existed between said parties.

16.    From approximately 2002 to 2006, Plaintiff had a successful career, working on a number of movies and televisions projects.  Throughout said time period, she was represented by DEFENDANTS, and each of them.

17.    In or about 2007, Plaintiff's father had a stroke.  Plaintiff felt obligated to take a hiatus from her career to assist in the care of her father, which she did for approximately three-years from 2007 through 2009.  During said time period, Plaintiff dedicated herself

000004

1  to her father and her family, and did not engage in or pursue her acting career.

2  18.    In or about late 2009, Plaintiff was ready to resume her career. However,

3  due to the dormancy of her career over the three-year period, her former managers were

4  unwilling to resume representing her. The only member of her former team who was

5  interested in continuing to represent her was MEYER.

6

7  19.    MEYER told Plaintiff that she was no longer young, that casting agents who

8  knew her were no longer casting, and that she would have difficulty getting jobs, but that

9  MEYER had the clout to help her. Plaintiff felt isolated and fearful for her future as an

10  actress.

11  20.    After MEYER agreed that he and STONE MEYER would continue to

12  represent Plaintiff, and that he and the firm had the ability to procure her work, he told

13  Plaintiff that she had to follow his advice and do what he told her, and if she disappointed

14  him she would never work in Hollywood again. He told Plaintiff stories of clients who did

15

16  not do as he told them and how he had ruined their careers. MEYER told Plaintiff that she

17  would need someone powerful like him to re-establish her career.

18  21.    Given her circumstances and her knowledge of MEYER's reputation and the

19  persons he represented, Plaintiff believed that MEYER had total control over her career.

20  She believed that if she upset him that he would do what he claimed to have done to

21  others, mainly insure that they would never work again in Hollywood.

22

23  22.    Due to her traditional and ultra-conservative upbringing, Plaintiff had never

24  taken roles that involved nudity, the performance of sexual acts, or which used foul

25  language. MEYER told Plaintiff that she was no longer young, and that she needed to

26  play more sexual provocative roles. He told her that being sexually inexperienced and

27  chaste was would make her less competitive for roles. He claimed that he could teach her

28

-5-

000005

1  how to be more sexual which would promote her career.

2      23.    In late 2009 and early 2010, MEYER started to send Plaintiff sexually crude
3  and vulgar emails and texts stating, among other things, his desire to have sex with
4  Plaintiff, as well as sending nude pictures of himself.    During the contact in the later part
5
6  of 2009, communications between Plaintiff and MEYER had not been in person but rather
7  were by email, text, or other similar means.  In or about early 2010, MEYER insisted that
8  Plaintiff see him in person, telling her that he needed to see her to assess that if she had
9  maintained herself.  In face-to-face meetings in MEYER's office in January, 2010, MEYER
10 sexually assaulted Plaintiff.   On another occasion took her to his mother's penthouse and
11 compelled her to perform oral sex.   MEYER continued to bombard Plaintiff with sexual
12 texts and emails.  In or about March, 2010, MEYER insisted that Plaintiff meet him in New
13 York.  When they met at his law firm's room at the St. Regis, MEYER forced Plaintiff to
14
15 have sexual relations with him.

16     24.    Plaintiff was fearful of MEYER and felt that he had control over her ability to
17 return to the acting profession and her entire future as an actress.  MEYER told Plaintiff
18 numerous times that he would ruin her if she did not do as he told.  Plaintiff was fearful of
19 MEYER and felt that if she did not accede to MEYER's demands, he would destroy any
20
   opportunity she had to re-establish her career.  MEYER used his position as Plaintiff's
21
22 attorney to intimidate her into a quid pro quo relationship wherein Plaintiff either acceded
23 to MEYER's sexual demands or he would terminate the attorney/client relationship and
24 insure that Plaintiff never worked in Hollywood again.

25     25.    MEYER preyed upon Plaintiff's vulnerability and made her his virtual sex
26 slave from on or about late 2009 through December, 2013.  During said time period,
27 MEYER compelled Plaintiff to engage in sexual relations numerous times, with the last
28

000006

1 such session in or about December, 2013. MEYER insisted that Plaintiff talk to him in an
2 affectionate manner, and demonstrate pleasure and satisfaction during the sexual
3 relations. MEYER made clear to Plaintiff that she would be punished if she failed to
4 comply with his demands. For example, if Plaintiff would cry or not manifest pleasure
5
6 during sexual relations, MEYER would become sexually violent, often physically injuring
7 Plaintiff. MEYER forced Plaintiff to accede to sexual acts that Plaintiff found repulsive,
8 humiliating, dehumanizing, painful and physically and mentally injurious.

9      26.    The course of abuse and subjugation by MEYER caused Plaintiff increasing
10 emotional and mental injury, ultimately to a point where she became totally disabled and
11 unable to function. All of the events alleged hereinabove occurred solely because of the
12 attorney/client relationship between MEYER and STONE MEYER on the one part, and
13 Plaintiff on the other.
14

15                          **FIRST CAUSE OF ACTION**

16          **FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

17                          **(Against all Defendants)**

18     27.    Plaintiff incorporates by reference the allegations contained in
19 paragraphs 1 through 26, and each and every part thereof with the same force and
20 effect as though fully set forth herein.
21

22     28.    Defendants, and each of them, engaged in conduct that was
23 outrageous.

24     29.    Defendants, and each of them, intended to cause Plaintiff severe
25 emotional distress or acted with reckless disregard of the probability that Plaintiff
26 would suffer severe emotional distress under the circumstances.

27     30.    Plaintiff did suffer severe emotional distress.
28

-7-
COMPLAINT FOR DAMAGES

000007

31. The conduct of Defendants, and each of them, was a substantial factor in causing the Plaintiff's severe emotional distress.

32. As a result of the aforesaid unlawful acts of Defendants, and each of them, Plaintiff has suffered and will suffer physical, mental, and emotional injuries, pain, distress, suffering, anguish, fright, nervousness, grief, anxiety, worry, shame, mortification, injured feelings, shock, humiliation, indignity, damage to reputation, aggravation, inconvenience, and other non-economic damages in a sum to be ascertained according to proof.

33. As a result of the aforesaid unlawful acts of Defendants, and each of them, Plaintiff was required and/or in the future may be required to engage the services of health care providers, and incurred expenses for health care, services, supplies, medicines, health care appliances, modalities, and/or other related expenses in a sum to be ascertained according to proof.

34. As a result of the aforesaid unlawful acts of Defendants, and each of them, Plaintiff has suffered and will continue to suffer loss of income, wages, earnings, earning capacity, and other economic loss in an amount according to proof. Plaintiff claims such amount as damages together with prejudgment interest pursuant to California *Civil Code* §3287 and/or any other provision of law providing for prejudgment interest.

35. As a result of the aforesaid unlawful acts of Defendants, and each of them, Plaintiff has suffered other incidental and consequential damages in an amount according to proof.

36. The aforesaid acts directed towards Plaintiff were carried out with a conscious disregard of Plaintiff's rights and with the intent to vex, injure, and annoy

000008

1   Plaintiff, such as to constitute oppression, fraud or malice pursuant to California *Civil*
2   *Code* §3294, entitling Plaintiff to punitive damages in a sum which is an amount
3   appropriate to punish and set an example of Defendants, and each of them, to deter
4   such conduct in the future, and to set an example for others.
5
6                           **SECOND CAUSE OF ACTION**

7                       **FOR BREACH OF FIDUCIARY DUTY**

8                          **(Against all Defendants)**

9       37.     Plaintiff   incorporates   by   reference   the   allegations   contained   in
10  paragraphs 1 through 36, and each and every part thereof with the same force and
11  effect as though fully set forth herein.
12
13      38.     At all times mentioned hereinabove, Defendants, and each of them,
14  were attorneys for Plaintiff.

15      39.     As attorneys for Plaintiff, Defendants, and each of them, owed Plaintiff a
16  fiduciary relation of the very highest character.

17      40.     Pursuant to California *Business & Professions Code §§6106.8* and
18  *6108.9*, it shall constitute cause for the imposition of discipline of an attorney for an
19  attorney to employ coercion, intimidation, or undue influence in entering into sexual
20  relations with a client.
21

22      41.     Defendant MEYER used his position with STONE MEYER as Plaintiff's
23  attorneys to compel the sexual relations with Plaintiff alleged hereinabove.   At all
24  times mentioned herein, DEFENDANTS knew or should have known that Defendant
25  MEYER was engaged in sexual relations with Plaintiff.

26      42.     The conduct of Defendants, and each of them, was a substantial factor
27  in causing harm to the Plaintiff.
28

000009

43. As a result of the aforesaid unlawful acts of Defendants, and each of them, Plaintiff has suffered and will suffer physical, mental, and emotional injuries, pain, distress, suffering, anguish, fright, nervousness, grief, anxiety, worry, shame, mortification, injured feelings, shock, humiliation, indignity, damage to reputation, aggravation, inconvenience, and other non-economic damages in a sum to be ascertained according to proof.

44. As a result of the aforesaid unlawful acts of Defendants, and each of them, Plaintiff was required and/or in the future may be required to engage the services of health care providers, and incurred expenses for health care, services, supplies, medicines, health care appliances, modalities, and/or other related expenses in a sum to be ascertained according to proof.

45. As a result of the aforesaid unlawful acts of Defendants, and each of them, Plaintiff has suffered and will continue to suffer loss of income, wages, earnings, earning capacity, and other economic loss in an amount according to proof. Plaintiff claims such amount as damages together with prejudgment interest pursuant to California _Civil Code_ §3287 and/or any other provision of law providing for prejudgment interest.

46. As a result of the aforesaid unlawful acts of Defendants, and each of them, Plaintiff has suffered other incidental and consequential damages in an amount according to proof.

47. The aforesaid acts directed towards Plaintiff were carried out with a conscious disregard of Plaintiff's rights and with the intent to vex, injure, and annoy Plaintiff, such as to constitute oppression, fraud or malice pursuant to California _Civil Code_ §3294, entitling Plaintiff to punitive damages in a sum which is an amount

000010

1  appropriate to punish and set an example of Defendants, and each of them, to deter

2  such conduct in the future, and to set an example for others.

3  ### THIRD CAUSE OF ACTION

4  ### FOR SEXUAL HARASSMENT IN VIOLATION OF CIVIL CODE §51.9

5

6  **(Against all Defendants)**

7  48.    Plaintiff   incorporates   by   reference   the   allegations   contained   in

8  paragraphs 1 through 47, and each and every part thereof with the same force and

9  effect as though fully set forth herein.

10  49.    At all times mentioned hereinabove, Defendants, and each of them, had

11  a professional relationship with Plaintiff as her attorneys and managers.  MEYER used

12  the position of Defendants as Plaintiff's attorneys to force Plaintiff into a quid pro quo

13  relationship wherein she was compelled to accede to MEYER's sexual demands.

14

15  50.    Defendant MEYER did engage in sexual relations with Plaintiff.

16  51.    The conduct of Defendant MEYER was unwelcome and also pervasive

17  or severe.

18  52.    Plaintiff   was   unable   to   easily   end   the   relationship   with   Defendant

19  MEYER.

20

21  53.    As a result of the aforesaid unlawful acts of Defendants, and each of

22  them, Plaintiff has suffered and will suffer physical, mental, and emotional injuries,

23  pain, distress, suffering, anguish, fright, nervousness, grief, anxiety, worry, shame,

24  mortification, injured feelings, shock, humiliation, indignity, damage to reputation,

25  aggravation, inconvenience, and other non-economic damages in a sum to be

26  ascertained according to proof.

27  54.    As a result of the aforesaid unlawful acts of Defendants, and each of

28

000011

them, Plaintiff was required and/or in the future may be required to engage the services of health care providers, and incurred expenses for health care, services, supplies, medicines, health care appliances, modalities, and/or other related expenses in a sum to be ascertained according to proof.

55. As a result of the aforesaid unlawful acts of Defendants, and each of them, Plaintiff has suffered and will continue to suffer loss of income, wages, earnings, earning capacity, and other economic loss in an amount according to proof. Plaintiff claims such amount as damages together with prejudgment interest pursuant to California *Civil Code* §3287 and/or any other provision of law providing for prejudgment interest.

56. As a result of the aforesaid unlawful acts of Defendants, and each of them, Plaintiff has suffered other incidental and consequential damages in an amount according to proof.

57. The aforesaid acts directed towards Plaintiff were carried out with a conscious disregard of Plaintiff's rights and with the intent to vex, injure, and annoy Plaintiff, such as to constitute oppression, fraud or malice pursuant to California *Civil Code* §3294, entitling Plaintiff to punitive damages in a sum which is an amount appropriate to punish and set an example of Defendants, and each of them, to deter such conduct in the future, and to set an example for others.

58. As a result of the Defendants' conduct, the Plaintiff has been required to retain the services of the law firm of Lipow & Harris and has and will incur attorney's fees to prosecute this action. Plaintiff is entitled to attorneys fees pursuant California *Civil Code* §52(b) and applicable statutes for bringing this claim.

000012

**WHEREFORE**, Plaintiff prays for relief and judgment against Defendants and each of them, jointly and severally, as follows:

### As to the First Cause of Action:

1. For non-economic damages in a sum to be ascertained according to proof for physical, mental, and emotional injuries, pain, distress, suffering, anguish, fright, nervousness, grief, anxiety, worry, shame, mortification, injured feelings, shock, humiliation, indignity, damage to reputation, aggravation, and inconvenience.

2. For economic damages for past and/or in the future medical expenses as may be required to engage the services of health care providers, and incurred expenses for health care, services, supplies, medicines, health care appliances, modalities, and/or other related expenses in a sum to be ascertained according to proof.

3. Economic damages for loss of income, wages, earnings, earning capacity, loss of promotions and/or the ability to promote, and other economic loss in an amount according to proof, plus prejudgment interest pursuant to California *Civil Code* §3287 and/or any other provision of law providing for prejudgment interest;

4. For punitive and exemplary damages in a sum which is an amount appropriate to punish and set an example of Defendants, and each of them, to deter such conduct in the future, and to set an example for others.

### As to the Second Cause of Action

5. For non-economic damages in a sum to be ascertained according to proof for physical, mental, and emotional injuries, pain, distress,

000013

suffering, anguish, fright, nervousness, grief, anxiety, worry, shame, mortification, injured feelings, shock, humiliation, indignity, damage to reputation, aggravation, and inconvenience.

6.    For economic damages for past and/or in the future medical expenses as may be required to engage the services of health care providers, and incurred expenses for health care, services, supplies, medicines, health care appliances, modalities, and/or other related expenses in a sum to be ascertained according to proof.

7.    Economic damages for loss of income, wages, earnings, earning capacity, loss of promotions and/or the ability to promote, and other economic loss in an amount according to proof, plus prejudgment interest pursuant to California *Civil Code* §3287 and/or any other provision of law providing for prejudgment interest;

8.    For punitive and exemplary damages in a sum which is an amount appropriate to punish and set an example of Defendants, and each of them, to deter such conduct in the future, and to set an example for others.

## As to the Third Cause of Action:

9.    For non-economic damages in a sum to be ascertained according to proof for physical, mental, and emotional injuries, pain, distress, suffering, anguish, fright, nervousness, grief, anxiety, worry, shame, mortification, injured feelings, shock, humiliation, indignity, damage to reputation, aggravation, and inconvenience.

10.    For economic damages for past and/or in the future medical expenses as may be required to engage the services of health care providers, and

-14-
COMPLAINT FOR DAMAGES

000014

incurred expenses for health care, services, supplies, medicines, health care appliances, modalities, and/or other related expenses in a sum to be ascertained according to proof.

11.  Economic damages for loss of income, wages, earnings, earning capacity, loss of promotions and/or the ability to promote, and other economic loss in an amount according to proof, plus prejudgment interest pursuant to California *Civil Code* §3287 and/or any other provision of law providing for prejudgment interest;

12.  For reasonable attorneys' fees.

13.  For punitive and exemplary damages in a sum which is an amount appropriate to punish and set an example of Defendants, and each of them, to deter such conduct in the future, and to set an example for others.

**As to all Causes of Action:**

14.  For costs of suit incurred herein; and

15.  For such other and further relief as the Court may deem just and proper.

Respectfully submitted,

Dated: April 9, 2015

LIPOW & HARRIS

By: _____
JEFFREY A. LIPOW
Attorneys for Plaintiff JANE DOE

-15-
COMPLAINT FOR DAMAGES

000015

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State bar number, and address): | FOR COURT USE ONLY |
|---|---|

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State bar number, and address):
JEFFREY A. LIPOW, ESQ.
LIPOW & HARRIS
18801 VENTURA BLVD.
SUITE 208
TARZANA, CALIFORNIA 91356
TELEPHONE NO.: (818) 905-0507 FAX NO.:
ATTORNEY FOR (Name): PLAINTIFF, JANE DOE

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
STREET ADDRESS: 111 N. Hill Street
MAILING ADDRESS: same as above
CITY AND ZIP CODE: Los Angeles, California 90012
BRANCH NAME: CENTRAL JUDICIAL DISTRICT

CASE NAME: JANE DOE v. NEIL MEYER

**FILED**
Superior Court of California
County of Los Angeles

APR 10 2015

Sherri R. Carter, Executive Officer/Clerk
By _Cristina Grijalva_, Deputy
Cristina Grijalva

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: BC 578370 |
|---|---|---|
| [X] Unlimited [ ] Limited (Amount demanded exceeds $25,000) (Amount demanded is $25,000 or less) | [ ] Counter [ ] Joinder Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE: DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)
**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[X] Other complaint (not specified above) (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition (not specified above) (43)

2. This case [ ] is [X] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought (check all that apply): a. [X] monetary b. [ ] nonmonetary; declaratory or injunctive relief c. [ ] punitive

4. Number of causes of action (specify): 3

5. This case [ ] is [X] is not a class action suit.

6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: April 9, 2015

JEFFREY A. LIPOW, ESQ.
(TYPE OR PRINT NAME)                    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Legal Solutions Plus

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10

000016

| SHORT TITLE: JANE DOE v. NEIL MEYER | CASE NUMBER BC 578370 |
|---|---|

## CIVIL CASE COVER SHEET ADDENDUM AND
## STATEMENT OF LOCATION
## (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

This form is required pursuant to Local Rule 2.0 in all new civil case filings in the Los Angeles Superior Court.

**Item I.** Check the types of hearing and fill in the estimated length of hearing expected for this case:

JURY TRIAL? [X] YES CLASS ACTION? [ ] YES LIMITED CASE? [ ] YES TIME ESTIMATED FOR TRIAL _____ [ ] HOURS/ [ ] DAYS

**Item II. Indicate** the correct district and courthouse location (4 steps – If you checked "Limited Case", skip to Item III, Pg. 4):

**Step 1:** After first completing the Civil Case Cover Sheet form, find the main Civil Case Cover Sheet heading for your case in the left margin below, and, to the right in Column **A**, the Civil Case Cover Sheet case type you selected.

**Step 2:** Check **one** Superior Court type of action in Column **B** below which best describes the nature of this case.

**Step 3:** In Column **C**, circle the reason for the court location choice that applies to the type of action you have checked. For any exception to the court location, see Local Rule 2.0.

| Applicable Reasons for Choosing Courthouse Location (see Column C below) |
|---|

1. Class actions must be filed in the Stanley Mosk Courthouse, central district.
2. May be filed in central (other county, or no bodily injury/property damage).
3. Location where cause of action arose.
4. Location where bodily injury, death or damage occurred.
5. Location where performance required or defendant resides.
6. Location of property or permanently garaged vehicle.
7. Location where petitioner resides.
8. Location wherein defendant/respondent functions wholly.
9. Location where one or more of the parties reside.
10. Location of Labor Commissioner Office

**Step 4:** Fill in the information requested on page 4 in Item III; complete Item IV. Sign the declaration.

| | **A**<br>Civil Case Cover Sheet<br>Category No. | **B**<br>Type of Action<br>(Check only one) | **C**<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| **Auto Tort** | Auto (22) | [ ] A7100 Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1., 2., 4. |
| | Uninsured Motorist (46) | [ ] A7110 Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1., 2., 4. |
| **Other Personal Injury/ Property Damage/ Wrongful Death Tort** | Asbestos (04) | [ ] A6070 Asbestos Property Damage<br>[ ] A7221 Asbestos - Personal Injury/Wrongful Death | 2.<br>2. |
| | Product Liability (24) | [ ] A7260 Product Liability (not asbestos or toxic/environmental) | 1., 2., 3., 4., 8. |
| | Medical Malpractice (45) | [ ] A7210 Medical Malpractice - Physicians & Surgeons<br>[ ] A7240 Other Professional Health Care Malpractice | 1., 4.<br>1., 4. |
| | Other<br>Personal Injury<br>Property Damage<br>Wrongful Death<br>(23) | [ ] A7250 Premises Liability (e.g., slip and fall)<br>[ ] A7230 Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.)<br>[ ] A7270 Intentional Infliction of Emotional Distress<br>[ ] A7220 Other Personal Injury/Property Damage/Wrongful Death | 1., 4.<br>1., 4.<br>1., 3.<br>1., 4. |

LACIV 109 (Rev. 03/11)
LASC Approved 03-04

**CIVIL CASE COVER SHEET ADDENDUM**
**AND STATEMENT OF LOCATION**

Local Rule 2.0
Page 1 of 4

LA-CV109

| SHORT TITLE: JANE DOE v. NEIL MEYER | CASE NUMBER |
|---|---|

| | **A**<br>Civil Case Cover Sheet<br>Category No. | **B**<br>Type of Action<br>(Check only one) | **C**<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| **Non-Personal Injury/ Property Damage/ Wrongful Death Tort** | Business Tort (07) | ☐ A6029 Other Commercial/Business Tort (not fraud/breach of contract) | 1., 3. |
| | Civil Rights (08) | ☐ A6005 Civil Rights/Discrimination | 1., 2., 3. |
| | Defamation (13) | ☐ A6010 Defamation (slander/libel) | 1., 2., 3. |
| | Fraud (16) | ☐ A6013 Fraud (no contract) | 1., 2., 3. |
| | Professional Negligence (25) | ☐ A6017 Legal Malpractice<br>A6050 Other Professional Malpractice (not medical or legal) | 1., 2., 3.<br>1., 2., 3. |
| | Other (35) | ☐ A6025 Other Non-Personal Injury/Property Damage tort | 2., 3. |
| **Employment** | Wrongful Termination (36) | ☐ A6037 Wrongful Termination | 1., 2., 3. |
| | Other Employment (15) | ☐ A6024 Other Employment Complaint Case<br>A6109 Labor Commissioner Appeals | 1., 2., 3.<br>10. |
| **Contract** | Breach of Contract/ Warranty (06)<br>(not insurance) | ☐ A6004 Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction)<br>☐ A6008 Contract/Warranty Breach -Seller Plaintiff (no fraud/negligence)<br>☐ A6019 Negligent Breach of Contract/Warranty (no fraud)<br>☐ A6028 Other Breach of Contract/Warranty (not fraud or negligence) | 2., 5.<br>2., 5.<br>1., 2., 5.<br>1., 2., 5. |
| | Collections (09) | ☐ A6002 Collections Case-Seller Plaintiff<br>☐ A6012 Other Promissory Note/Collections Case | 2., 5., 6.<br>2., 5. |
| | Insurance Coverage (18) | ☐ A6015 Insurance Coverage (not complex) | 1., 2., 5., 8. |
| | Other Contract (37) | ☐ A6009 Contractual Fraud<br>☐ A6031 Tortious Interference<br>☐ A6027 Other Contract Dispute(not breach/insurance/fraud/negligence) | 1., 2., 3., 5.<br>1., 2., 3., 5.<br>1., 2., 3., 8. |
| **Real Property** | Eminent Domain/Inverse Condemnation (14) | ☐ A7300 Eminent Domain/Condemnation        Number of parcels _____ | 2. |
| | Wrongful Eviction (33) | ☐ A6023 Wrongful Eviction Case | 2., 6. |
| | Other Real Property (26) | ☐ A6018 Mortgage Foreclosure<br>☐ A6032 Quiet Title<br>☐ A6060 Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2., 6.<br>2., 6.<br>2., 6. |
| **Unlawful Detainer** | Unlawful Detainer-Commercial (31) | ☐ A6021 Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Detainer-Residential (32) | ☐ A6020 Unlawful Detainer-Residential (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Detainer-Post-Foreclosure (34) | ☐ A6020F Unlawful Detainer-Post-Foreclosure | 2., 6. |
| | Unlawful Detainer-Drugs (38) | ☐ A6022 Unlawful Detainer-Drugs | 2., 6. |

LACIV 109 (Rev. 03/11)
LASC Approved 03-04

**CIVIL CASE COVER SHEET ADDENDUM**
**AND STATEMENT OF LOCATION**

Local Rule 2.0
Page 2 of 4

000018



| SHORT TITLE: JANE DOE v. NEIL MEYER | | CASE NUMBER |
|---|---|---|

| | **A**<br>Civil Case Cover Sheet<br>Category No. | **B**<br>Type of Action<br>(Check only one) | **C**<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| **Judicial Review** | Asset Forfeiture (05) | ☐ A6108  Asset Forfeiture Case | 2., 6. |
| | Petition re Arbitration (11) | ☐ A6115  Petition to Compel/Confirm/Vacate Arbitration | 2., 5. |
| | Writ of Mandate (02) | ☐ A6151  Writ - Administrative Mandamus<br>☐ A6152  Writ - Mandamus on Limited Court Case Matter<br>☐ A6153  Writ - Other Limited Court Case Review | 2., 8.<br>2.<br>2. |
| | Other Judicial Review (39) | ☐ A6150  Other Writ /Judicial Review | 2., 8. |
| **Provisionally Complex Litigation** | Antitrust/Trade Regulation (03) | ☐ A6003  Antitrust/Trade Regulation | 1., 2., 8. |
| | Construction Defect (10) | ☐ A6007  Construction Defect | 1., 2., 3. |
| | Claims Involving Mass Tort (40) | ☐ A6006  Claims Involving Mass Tort | 1., 2., 8. |
| | Securities Litigation (28) | ☐ A6035  Securities Litigation Case | 1., 2., 8. |
| | Toxic Tort<br>Environmental (30) | ☐ A6036  Toxic Tort/Environmental | 1., 2., 3., 8. |
| | Insurance Coverage Claims<br>from Complex Case (41) | ☐ A6014  Insurance Coverage/Subrogation (complex case only) | 1., 2., 5., 8. |
| **Enforcement of Judgment** | Enforcement<br>of Judgment (20) | ☐ A6141  Sister State Judgment<br>☐ A6160  Abstract of Judgment<br>☐ A6107  Confession of Judgment (non-domestic relations)<br>☐ A6140  Administrative Agency Award (not unpaid taxes)<br>☐ A6114  Petition/Certificate for Entry of Judgment on Unpaid Tax<br>☐ A6112  Other Enforcement of Judgment Case | 2., 9.<br>2., 6.<br>2., 9.<br>2., 8.<br>2., 8.<br>2., 8., 9. |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ A6033  Racketeering (RICO) Case | 1., 2., 8. |
| | Other Complaints<br>(Not Specified Above) (42) | ☐ A6030  Declaratory Relief Only<br>☐ A6040  Injunctive Relief Only (not domestic/harassment)<br>☐ A6011  Other Commercial Complaint Case (non-tort/non-complex)<br>☒ A6000  Other Civil Complaint (non-tort/non-complex) | 1., 2., 8.<br>2., 8.<br>1., 2., 8.<br>1., 2., 8. |
| **Miscellaneous Civil Petitions** | Partnership Corporation<br>Governance (21) | ☐ A6113  Partnership and Corporate Governance Case | 2., 8. |
| | Other Petitions<br>(Not Specified Above)<br>(43) | ☐ A6121  Civil Harassment<br>☐ A6123  Workplace Harassment<br>☐ A6124  Elder/Dependent Adult Abuse Case<br>☐ A6190  Election Contest<br>☐ A6110  Petition for Change of Name<br>☐ A6170  Petition for Relief from Late Claim Law<br>☐ A6100  Other Civil Petition | 2., 3., 9.<br>2., 3., 9.<br>2., 3., 9.<br>2.<br>2., 7.<br>2., 3., 4., 8.<br>2., 9. |

**CIVIL CASE COVER SHEET ADDENDUM<br>AND STATEMENT OF LOCATION**

000019

| SHORT TITLE: JANE DOE v. NEIL MEYER | | CASE NUMBER |
|---|---|---|

**Item III.** Statement of Location: Enter the address of the accident, party's residence or place of business, performance, or other circumstance indicated in Item II., Step 3 on Page 1, as the proper reason for filing in the court location you selected.

| REASON: Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected for this case. | ADDRESS: 9665 WILSHIRE BLVD., #500 | |
|---|---|---|
| ☐1. ☒2. ☐3. ☐4. ☐5. ☐6. ☐7. ☐8. ☐9. ☐10. | | |

| CITY: | STATE: | ZIP CODE: |
|---|---|---|
| BEVERLY HILLS | CA | 90212 |

**Item IV.** *Declaration of Assignment*: I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that the above-entitled matter is properly filed for assignment to the STANLEY MOSK courthouse in the CENTRAL District of the Superior Court of California, County of Los Angeles [Code Civ. Proc., § 392 et seq., and Local Rule 2.0, subds. (b), (c) and (d)].

Dated: April 9, 2015

(SIGNATURE OF ATTORNEY/FILING PARTY)

JEFFREY A. LIPOW

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.

2. If filing a Complaint, a completed Summons form for issuance by the Clerk.

3. Civil Case Cover Sheet, Judicial Council form CM-010.

4. Civil Case Cover Sheet Addendum and Statement of Location form, LACIV 109, LASC Approved 03-04 (Rev. 03/11).

5. Payment in full of the filing fee, unless fees have been waived.

6. A signed order appointing the Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court in order to issue a summons.

7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

**CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION**

# EXHIBIT 4



Ironshore Claims LLC

One State Street Plaza, 7th Floor
New York, NY 10004
Main # 646-826-6600

Writer's Direct Dial and Email:
(646) 826-4976
Howard.Panensky@ironshore.com

May 20, 2015

**VIA E-MAIL & CERTIFIED MAIL**


**jderose@HARTAN.COM**

Doug Stone
Stone, Meyer, Genow, Smelkinson & Binder, LLP
9665 Wilshire Blvd., 5th Floor
Beverly Hills, CA 90212


| | |
|---|---|
| Insured: | Stone, Meyer, Genow, Smelkinson & Binder, LLP |
| Claimant: | Jane Doe |
| Claim No.: | PRO00041899 |
| Coverage: | Lawyers Professional Liability Policy |
| Policy No.: | 002311800 |
| Matter: | *Jane Doe v. Neil Ettin Meyer, et al.* |

Dear Mr. Stone:

Ironshore Specialty Insurance Company ("Ironshore") has retained Ironshore Claims LLC to handle the captioned matter under Lawyers Professional Liability Policy No. 002311800 (the "Policy"), which was issued to Stone, Meyer, Genow, Smelkinson & Binder, LLP ("Stone Meyer"). We have reviewed a copy of the Complaint captioned *Jane Doe v. Neil Ettin Meyer, et al.* (Case No. BC578370) (the "Doe Action"), which was filed on April 10, 2015 in the California Superior Court, Los Angeles County against Neil Ettin Meyer ("Meyer") and Stone Meyer (the "Defendants"). We are directing this letter to you as the authorized representative of Meyer and Stone Meyer under the Policy. To the extent that you are not acting on their behalf for insurance coverage purposes, we request that you promptly forward a copy of this letter to Meyer and Stone Meyer and/or their authorized insurance representatives. For the reasons discussed below, the Policy does not provide any coverage for the Doe Action and Ironshore does not have a duty to defend Meyer or Stone Meyer in this matter.

**The Doe Action**

Plaintiff alleges that she was the victim of sexual assault, battery, and rape over a period of years. According to the Complaint, from 2002 to 2006, Plaintiff had a successful acting career in

Mr. Doug Stone
May 20, 2015
Page 2 of 5

movies and television projects, and, throughout that time, she was represented by Meyer and his firm, Stone Meyer.  Plaintiff then allegedly took a three-year hiatus from her career to assist in the care of her father.  However, in 2009, when Plaintiff was ready to resume her career, her former managers were unwilling to resume representing her, and Meyer allegedly was the only member of her former team who was interested in continuing to represent her.  According to the Complaint, Meyer agreed that he and his firm had the ability to procure her work.

Plaintiff alleges that Meyer used his position as Plaintiff's attorney to intimidate her into a quid pro quo relationship wherein Plaintiff either acceded to Meyer's sexual demands or he would terminate the attorney/client relationship and insure that she never worked in Hollywood again.  Plaintiff proceeds to allege that Meyer preyed upon her vulnerability and made her his "virtual sex slave" from 2009 to 2013, compelling Plaintiff to engage in sexual relations numerous times.  Meyer allegedly made clear to Plaintiff that she would be punished if she failed to comply with his demands—if Plaintiff would cry or not manifest pleasure during sexual relations, Meyer would become sexually violent, often physically injuring Plaintiff.  It is further alleged that Meyer forced Plaintiff to accede to sexual acts that Plaintiff found repulsive, humiliating, dehumanizing, painful, and physically and mentally injurious.  As alleged, the course of abuse and subjugation by Meyer caused Plaintiff increasing emotional and mental injury, ultimately to a point where she became "totally disabled and unable to function."

Plaintiff asserts three causes of action: Intentional Infliction of Emotional Distress, Breach of Fiduciary Duty, and Sexual Harassment in Violation of Civil Code § 51.9.  In summarizing our understanding of the allegations, we lend no credence that any of the allegations are true.

**The Policy**

As you know, Ironshore issued Lawyers Professional Liability Policy No. 002311800 to Stone Meyer, providing coverage, subject to the Policy's terms, for Claims[1] first made from February 28, 2015 to February 28, 2016.  The Policy, pursuant to Item 3 of its Declarations, contains a Limit of Liability of $5,000,000 and is subject to a $50,000 Deductible.  Pursuant to Section I.A, the Policy provides:

> The Insurer shall pay on behalf of each Insured all sums the Insured shall become legally obligated to pay as Damages as a result of a Claim first made against the Insured during the Policy Period and reported to the Insurer during the Policy Period and arising out of the rendering of or failure to render Professional Legal Services.

**Coverage Position**

First, the Doe Action does not arise out of the rendering of or failure to render "Professional Legal Services."   Section II.M of the Policy defines "Professional Legal Services" as "legal

---

[1]     All capitalized terms in this letter, unless otherwise defined, shall have the same meaning as provided in the Policy.  Please read this letter in conjunction with the referenced policy of insurance.

Mr. Doug Stone
May 20, 2015
Page 3 of 5

services and activities performed for others as a lawyer . . . ."  Allegations of sexual assault, battery, and rape do not constitute legal services or the failure to render legal services. Moreover, while the Complaint alleges that an attorney-client relationship existed between the parties from 2002 to 2015, Plaintiff does not allege any legal services were performed or should have taken place during the course of the alleged wrongdoing from 2009 to 2013, and therefore the Defendants are not alleged to have rendered or failed to render any legal service for Plaintiff in connection with the sexual assault.  In the absence of Professional Legal Services that took place or should have taken place, the Doe Action does not trigger coverage under the Policy. Accordingly, Ironshore hereby denies coverage on this basis.

While the lack of Professional Legal Services, alone, warrants a denial of coverage for the Doe Action in its entirety, we thought it would be appropriate to bring your attention to other issues that otherwise preclude or limit coverage for this matter.  Pursuant to Section III.F, the Policy provides:

> The Insurer shall not be liable to make any payments in connection with any Claim made against any Insured . . . for any actual or alleged Bodily Injury, Property Damage, mental anguish or emotional distress arising from such Bodily Injury or Property Damage, except this exclusion shall not apply to mental anguish or emotional distress arising from Personal Injury[.]

"Bodily Injury" is defined in Section II.B as "physical injury, sickness, disease or death of any person."  The crux of the Doe Action is the alleged sexual assault, battery, and rape of Plaintiff, and each cause of action is premised on such acts and related physical and emotional injuries. Such wrongdoing clearly constitutes Bodily Injury, and the Doe Action therefore constitutes a Claim for alleged Bodily Injury or mental anguish or emotional distress arising from such Bodily Injury.  Accordingly, even if the Doe Action implicated the Policy's Insuring Agreement (and it does not), Section II.F would entirely exclude coverage for this matter in any event, and Ironshore therefore denies coverage on this basis as well.

In addition, California statutory law also precludes coverage for the Doe Action.  More specifically, Section 533 of the California Insurance Code provides that "[a]n insurer is not liable for a loss caused by the willful act of the insured; but he is not exonerated by the negligence of the insured, or of the insured's agents or others."  Given that the alleged sexual assault, battery, and rape constitute willful acts, Ironshore cannot be liable for any resulting loss uninsurable as a matter of law.

Moreover, in view of the nature of the allegations and time period during which the alleged wrongdoing took place, Ironshore has serious concerns regarding what knowledge Meyer and Stone Meyer had at the time Stone Meyer procured insurance from Ironshore.  It is unlikely that a lawsuit of this nature would arise without Meyer or Stone Meyer being aware of circumstances reasonably likely to lead to a Claim or Disciplinary Proceeding.  Ironshore is perplexed that it did not receive any advance notice regarding a sexual relationship between Meyer and Plaintiff, regardless of whether such relationship was consensual or the product of coercion.  With this in mind, we first would like to bring your attention to Section III.E of the Policy, which provides:

**000003**

Mr. Doug Stone
May 20, 2015
Page 4 of 5

> The Insurer shall not be liable to make any payments in connection with any Claim made against any Insured . . . alleging, arising out of, based upon or attributable to Professional Legal Services if an Insured, prior to the effective date of the first Lawyers Professional Liability Policy issued by the Insurer to the Insured, had knowledge of the circumstances that gave rise to the Claim and reason to believe that a Claim might result[.]

Although this matter does not arise out of Professional Legal Services, the allegations suggest that an Insured (Meyer and/or Stone Meyer) was aware of circumstances that gave rise to the Doe Action and had reason to believe that this Claim might result.  In this regard, we reiterate that, even if the Defendants assert that the alleged sexual relationship was consensual, an attorney having sexual relations with a client still provides an Insured with "reason to believe that a Claim might result."  Therefore, Ironshore reserves its rights as to the applicability of Section III.E as an additional basis for denying coverage for the Doe Action.

In light of the foregoing, Ironshore also questions the veracity of the representations made by Stone Meyer when applying for insurance with Ironshore.  Pursuant to Endorsement No. 2, the Policy provides:

> [T]he Insurer has relied upon the statements and representations contained in the [Lloyd's of London Application for Lawyers Professional Liability Insurance signed on January 12, 2015] (including materials submitted thereto and, if such application is a renewal application, all such previous policy applications, and their attachments and materials, for which this Policy is a renewal or succeeds in time) as being accurate and complete.  It is further understood and agreed that the Insured warrants and represents to the Insurer that the statements and representations made in the [Lloyd's of London Application] were accurate on [January 12, 2015] as if it was made to the Insurer on such date.  All such statements and representations shall be deemed to be material to the risk assumed by the Insurer, are the basis of this Policy and are to be considered as incorporated into this Policy.

In Question 10.C, the Lloyd's of London Application asks:

> After enquiry, are any persons listed in Supplement 1[2] aware of any circumstances, allegations, tolling agreements or contentions as to any incident which may result in a claim being made against the Applicant or any of its past or present Owners, Partners, Shareholders, Corporate Officers, Associates, Employed lawyers, Contract Lawyers or Employees or its predecessors in business?

Stone Meyer responded to this question in the negative by marking the "No" checkbox. However, Stone Meyer had a duty to disclose any sexual relationship between a partner of the firm and a client, regardless of whether the relationship was consensual, given that such

---

[2]      Meyer is among the persons listed in Supplement 1.

Mr. Doug Stone
May 20, 2015
Page 5 of 5

circumstances may result in a claim against Meyer and/or Stone Meyer.  Had Ironshore been aware of such circumstances, at the very least, it would not have agreed to provide coverage for "Full Prior Acts" and instead would have included a Retroactive Date or otherwise would have included an endorsement to exclude any Claim or Disciplinary Proceeding arising from such circumstances.  As this appears to be a material misrepresentation in the Application, Ironshore also reserves its rights to rescind the Policy.

Finally, we note that the Doe Action could be potentially covered under other insurance that Meyer or Stone Meyer may have procured, such as a policy providing coverage for employment practices liability or commercial liability or a homeowners insurance policy.  Ironshore suggests that the Defendants report the Doe Action under any other insurance policy.  With this in mind, Ironshore also reserves its rights as to Section X.C of the Policy, which provides:

> Subject to Section V.E, the insurance afforded by this Policy shall only apply as excess over any other valid policy or policies, whether such other policy or policies are stated to be primary, contributory, excess, contingent or otherwise.

Please note that the foregoing analysis is not intended to be exhaustive as to all other potentially applicable provisions of the Policy that may similarly preclude or limit coverage and have not been addressed in this letter.  Therefore, Ironshore reserves all of its rights, remedies, and defenses for this matter under the Policy, in equity, and at law.

Should you have any additional information that you feel would either cause Ironshore to review its position or assist us in our investigation or determination, we ask that you kindly advise us as soon as possible.  While we encourage you to contact us in the first instance, you may be entitled to have this matter reviewed by the California Department of Insurance.  The contact information is as follows:

> California Department of Insurance
> Consumer Services Division
> 300 South Spring Street, South Tower
> Los Angeles, CA  90013
> (800) 927-HELP (4357) (within California)
> (213) 897-8921 (outside California)

Of course, should you have any questions regarding this letter or Ironshore's coverage position, please feel free to contact me.

Very truly yours,

Howard E. Panensky, Esq.
Assistant Vice President
Ironshore Claims LLC

**000005**

# EXHIBIT 5

**LINER** LLP

1100 Glendon Avenue | 14th Floor
Los Angeles, CA 90024.3518

310.500.3500 main
310.500.3501 fax

August 7, 2015

**Via E-Mail  howard.panensky@ironshore.com AND U.S. Mail**

Howard E. Panensky, Esq.
Assistant Vice President
Ironshore Claims LLC
One State Street Plaza, 7th Floor
New York, NY 10004

RE:   Insured:  Stone, Meyer, Genow, Smelkinson & Binder, LLP
      Claim No. PRO00041899
      Policy No. 002311800

Dear Mr. Panensky:

We received your May 20, 2015 letter.  In short, Stone, Meyer, Genow, Smelkinson & Binder, LLP ("Stone Meyer") disagrees with Ironshore's denial of coverage and demands that Ironshore immediately reverse its coverage position and agree to pay for Stone Meyer's independent counsel to defend the *Jane Doe v. Neil Ettin Meyer* lawsuit.

## I.   FACTUAL SUMMARY

On April 10, 2015, Jane Doe filed a complaint against Neil Ettin Meyer, individually, and Stone Meyer, for breach of fiduciary duty, intentional infliction of emotional distress, and sexual harassment in violation of Civil Code section 51.9.  The complaint contains allegations that Ms. Doe retained Stone Meyer to promote Ms. Doe's acting career and provide legal services in connection therewith, Mr. Meyer and Stone Meyer were her attorneys, and an attorney-client relationship existed between them "from approximately 2002 to 2015."  Complaint, ¶ 15.  The complaint also contains allegations that in late 2009 and early 2010, Mr. Meyer began to send vulgar e-mails and texts to Ms. Doe and that in 2010, Mr. Meyer sexually assaulted Ms. Doe.  The complaint contains further allegations that Mr. Meyer "made [Ms. Doe] his virtual sex slave from on or about late 2009 through December 2013."  *Id.*, ¶ 25.  The complaint also contains the allegation that all of the events alleged "occurred solely because of the attorney/client relationship between Meyer and Stone Meyer on the one part, and Plaintiff on the other."  *Id.*, ¶ 26.  The complaint contains a request for monetary damages, costs of suit, attorney's fees, and other relief as the court deems just and proper.

Howard E. Panensky, Esq.
August 7, 2015
Page 2

The engagement agreement between Ms. Doe and Stone Meyer contained an arbitration agreement. Accordingly, on June 15, 2015, Stone Meyer filed a Motion to Compel Arbitration, which was granted on July 17, 2015. In particular, the Court found "the complaint makes clear that *all of the claims are based on the attorney/client relationship*. For that reason, Plaintiff's causes of action are likely within the ambit of the agreement." (emphasis added). Indeed, the Court focused on the complaint's allegation that "[a]ll of the events alleged hereinabove occurred *solely because of the attorney/client relationship* between Meyer and Stone Meyer on the one part, and Plaintiff on the other." (emphasis added) A copy of the Notice of Order Granting Motion to Compel Arbitration is enclosed. Thus, the court already has determined that the claims involved at least potentially arise out of the attorney-client relationship.

## II.   THE POLICY

Ironshore issued Lawyers Professional Liability Policy No. 002311800 to Stone Meyer, which was effective for the policy period February 28, 2015, to February 28, 2016.

The Policy covers "Damages" and "Claim Expenses" for claims arising out of the rendering of or failure to render "Professional Legal Services." The Policy has a $5,000,000 limit of liability (each claim) and an aggregate limit of $5,000,000 for all Claims made or deemed made during the Policy Period.

The Insuring Agreement of the Policy obligates Ironshore to

> pay on behalf of each Insured all sums the Insured shall become legally obligated to pay as Damages as a result of a Claim first made against the Insured during the Policy Period and reported to the Insurer during the Policy Period and arising out of the rendering of or failure to render Professional Legal Services.

The Insuring Agreement mandates that Ironshore

> defend any Claim first made against the Insured during the Policy Period and reported to the Insurer during the Policy Period and arising out of the rendering of or failure to render Professional Legal Services, including an appeal thereof, seeking Damages to which this insurance applies even if any of the allegations are groundless, false, or fraudulent.

The Policy defines "Damages" as

> a monetary judgment or settlement, including any such judgment or settlement for Personal Injury . . . .

The Policy defines "Personal Injury" as

Howard E. Panensky, Esq.
August 7, 2015
Page 3

1. False arrest, detention or imprisonment;
2. Malicious prosecution;
3. Libel or slander or other defamatory or disparaging materials;
4. Publication or an utterance in violation of an individual's right to privacy;
5. Wrongful entry or eviction, or other invasion of the right to private occupancy; and
6. Mental anguish, mental injury, shock, humiliation, emotional distress or fright, if arising out of 1. through 5. above.

The Policy defines "Professional Legal Services" as

legal services and activities performed for others as a lawyer . . . .

III.   **COVERAGE**

  A.   **The Potential for Coverage Requires Ironshore to Defend**

The *Doe* lawsuit seeks damages and alleges injury caused by intentional infliction of emotional distress, breach of fiduciary duty, and sexual harassment, which "occurred solely because of the attorney/client relationship between Meyer and Stone Meyer on the one part, and [Ms.Doe] on the other."  Complaint, ¶ 26.  These allegations alone raise the potential for coverage and require Ironshore to defend Stone Meyer because they are a Claim, which was made and reported during the Policy Period, allegedly arising out of Professional Legal Services, seeking Damages.  *See Gray v. Zurich Ins. Co.*, 65 Cal. 2d 263, 275 (1966) (insurer must defend a suit that "*potentially* seeks damages within the coverage of the policy"); *Horace Mann Ins. Co. v. Barbara B.*, 4 Cal. 4th 1076, 1084 (1993) (same).  The law is clear that Ironshore has a duty to defend Stone Meyer against the *Doe* lawsuit because there is at least a potential, or possibility, of coverage.  *See Montrose Chem. Corp. v. Superior Court*, 6 Cal. 4th 287, 299 (1993) ("[T]he insured is entitled to a defense if the underlying complaint alleges the insured's liability for damages *potentially* covered under the policy, or if the complaint might be amended to give rise to a liability that would be covered under the policy."); *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031-32 (9th Cir. 2008) (same).  "Any doubt as to whether the facts establish the existence of the defense duty must be resolved in the insured's favor."  *Montrose*, 6 Cal. 4th at 299-300.

Moreover, if any allegation in a complaint is potentially covered, an insurer's defense duty extends to the entire action.  *See Horace Mann*, 4 Cal. 4th at 1084 ("We look not to whether noncovered acts predominate in the third party's action, but rather to whether there is *any* potential for liability under the policy").  Ironshore can escape this duty only if it can show what defense costs "can be allocated solely to the claims that are not even potentially covered."  *Buss v. Superior Court*, 16 Cal. 4th 35, 53 9997).  Its burden is one "that, 'if ever feasible,' may be 'extremely difficult.'"  *Id.* at 58 (quoting *Hogan v. Midland Nat'l Ins. Co.*, 3 Cal. 3d 553, 564 (1970)).

Howard E. Panensky, Esq.
August 7, 2015
Page 4

Furthermore, courts construe allegations in the underlying complaint liberally so that Ironshore cannot escape its defense duty based on any inartful drafting of the Doe complaint.  *See, e.g., CNA Cas. of Cal. v. Seaboard Sur. Co.*, 176 Cal. App. 3d 598, 609 (1986) ("[I]t is not the form or title of a cause of action that determines the carrier's duty to defend, but the potential liability suggested by the facts alleged or otherwise available to the insurer.");  *Pension Trust Fund for Operating Eng'rs v. Fed. Ins. Co.*, 307 F.3d 944, 951 (9th Cir. 2002) ("California courts have repeatedly found that remote facts buried within causes of action that may potentially give rise to coverage are sufficient to invoke the defense duty."  Ironshore "cannot construct a formal fortress of the third party's pleadings and retreat behind its walls."  *Gray*, 65 Cal. 2d at 276.  Thus, the only way Ironshore can escape its duty to defend Stone Meyer is if the *Doe* lawsuit could "by no conceivable theory [have raised] a single issue which could bring it within the policy coverage."  *Id.* at 275-726 n.15.  In short, Ironshore must "show the complete and absolute absence of" any possibility of coverage.  *Pension*, 307 F.3d at 955.  Ironshore cannot do so.

Moreover, in order for Ironshore to fulfill its duties under the Policy, it must give at least as much consideration to the interests of Stone Meyer as it gives to its own interests.  *Egan v. Mut. of Omaha Ins. Co.*, 24 Cal. 3d 809, 819 (1979).  Ironshore had a duty to conduct a full investigation of the coverage possibilities before taking its coverage position:  "it is essential that an insurer fully inquire into possible bases that might support the insured's claim . . .  An insurer cannot reasonably and in good faith deny payments to its insured without thoroughly investigating the foundation for its denial."  *Id.*  Ironshore's cursory read of the complaint followed by its denial of coverage demonstrates a lack of an appropriate investigation.  *See Eigner v. Worthington*, 57 Cal. App. 4th 188, 198 (1997) (insurer breached the duty to investigate by reviewing only the policy and the underlying complaint; "extrinsic evidence showing potential coverage was available when [the insurer] declined to defend or investigate" and a reasonable investigation would have "revealed facts giving rise to [the] duty to defend").

As Ironshore knows, it had an immediate duty to assume its insured's defense in the *Doe* lawsuit—even though it may not have completed (or even begun) its investigation.  "The defense duty is a continuing one, arising on tender of defense . . . .  Imposition of an immediate duty to defend is necessary to afford the insured what it is entitled to: the full protection of a defense on its behalf."  *Montrose*, 6 Cal. 4th at 295.  *See Aerojet-Gen. Corp. v. Transport Indem. Co.*, 17 Cal. 4th 38, 60 (1997) ("to defend meaningfully, it must defend immediately, and to defend immediately, it must defend entirely").  As explained below, Stone Meyer is entitled to a defense and Ironshore must immediately agree to do so.

>    **B.    The Claims Arise From "Professional Legal Services"**

Ironshore's position that the *Doe* lawsuit "does not arise out of the rendering or failure to render "'Professional Legal Services'" is incorrect.

Howard E. Panensky, Esq.
August 7, 2015
Page 5

First, Ms. Doe alleges she hired Stone Meyer to assist and further her acting career.  *See* Complaint, ¶¶ 14-20.  She also alleges that in order to further her career and continue her attorney/client relationship with Mr. Meyer and Stone Meyer, she was forced to engage in certain activities.  *Id.*, ¶¶ 20, 24.  Accordingly, Ms. Doe explicitly states that her injuries "occurred solely because of the attorney/client relationship."  *Id.*, ¶ 26.  Although Stone Meyer denies liability for any wrongdoing, the *Doe* lawsuit nevertheless alleges the firm was providing Professional Legal Services.

Second, Stone Meyer filed a Motion to Compel Arbitration.  As noted above, in granting that motion, the Court expressly held "the complaint makes clear that all of the claims are based on the attorney/client relationship.  For that reason, Plaintiff's causes of action are likely within the ambit of that agreement."  Indeed, the Court focused on the complaint's allegation that "[a]ll of the events alleged hereinabove occurred solely because of the attorney/client relationship between Meyer and Stone Meyer on the one part, and Plaintiff on the other."

Ironshore simply cannot turn a blind eye to the allegations in the complaint or the Court's holding— particularly when both show at least the possibility of coverage (if not more)—all that is required to trigger Ironshore's duty to defend.

C.      The *Doe* Lawsuit Alleges "Personal Injuries"

The *Doe* lawsuit also can be read to include a claim for Personal Injuries as a result of false imprisonment.  Ms. Doe alleges she was sexually assaulted in **Mr. Meyer's office**, his mother's penthouse, and in "**his law firm's room** at the St. Regis."  Complaint, ¶ 23 (emphasis added).  Arguably, under the alleged circumstances, Ms. Doe may have been deprived of her freedom by use of force, threats of force, and/or unreasonable duress, and that the restraint, confinement, or detention compelled Ms. Doe to stay in those locations without her consent, causing her harm.  *See* CACI 1400; *Fermino v. Fedco, Inc.*, 7 Cal. 4th 701, 716 (1994) (elements of false imprisonment); *Hartford Acc. & Indem. Co. v. Krekeler*, 491 F.2d 884, 887 (8th Cir. 1974) (battery committed in residence was covered because battery was made possible by trespass, which was within policy's "personal injury" coverage for "wrongful entry"); *Accredited Bond Agencies, Inc. v. Gulf Ins. Co.*, 352 So. 2d 1252, 1254 (Fla. Ct. App. 1977) (insured entitled to defense against suit alleging assault and battery after wrongful entry).  False imprisonment is specifically included in the definition of "Personal Injury," as are "mental anguish, mental injury, shock, humiliation, emotional distress or fright, if arising out of [false imprisonment]."  Ms. Doe alleges she suffered all forms of these injuries, which are covered by the Policy.  In light of Stone Meyer's potential liability for false imprisonment, Ironshore must defend.

Contrary to Ironshore's assertion, the allegations are not limited to "Bodily Injury."  Indeed, the "Bodily Injury" exclusion clearly states that "this exclusion shall not apply to mental anguish or emotional distress arising from Personal Injury."  As illustrated above, there is a clear potential for coverage for false imprisonment and Ms. Doe's alleged injuries.

20710.001-2469577v2

Howard E. Panensky, Esq.
August 7, 2015
Page 6

### D.   Allegations of Intentional Conduct Do Not Preclude Coverage

Ironshore incorrectly states that California statutory law precludes coverage for the *Doe* lawsuit because the lawsuit involves claims of wilful acts.  Ironshore is wrong for several reasons.  First, the Policy expressly covers malicious prosecution, which involves a wilful act.

Second, California Insurance Code section 533 "precludes only *indemnification* of wilful conduct and not the *defense* of an action, in which such conduct is alleged." *Downey Venture v. LMI Ins. Co.*, 66 Cal. App. 4th 478 (1998) (quoting *B&E Convalescent Ctr. v. State Comp. Ins. Fund*, 8 Cal. App. 4th 78 ) (1992)). Thus, the allegation of wilful acts does not excuse Ironshore from defending Stone Meyer.

Third, Ironshore cannot establish that Stone Meyer intended to cause harm to Ms. Doe.  *See Safeco*, 26 Cal. 4th at 765 (an insured's unintentional shooting of another child was covered because, although the insured pulled the trigger intentionally, he believed the gun to be unloaded and did not intend gun to fire); *Gray*, 65 Cal. 2d at 273 n.12 ("an act which under the traditional terminology of the law of torts is denominated 'intentional' or 'wilful'" does not necessarily fall outside insurance coverage"); *Mullen v. Glen Falls Ins. Co.*, 73 Cal. App. 3d 163, 171 (1977) (recognizing potential for coverage when "(i)t is possible that an act of the insured may carry out his 'intention' and also cause unintended harm"); *accord Horace Mann*, 4 Cal. 4th at 1083-87 (duty to defend suit in which "dominant factor" was sexual molestation because of possibility of coverage for nonsexual battery).

Fourth, Section 533 does not preclude an insurer from indemnifying insureds that did not actually commit the act.  *See Lisa M. v. Henry Mayo Newhall Mem'l. Hosp.*, 12 Cal. 4th 291 (1995).  Indeed, California recognizes that in a corporate setting, even if the officers or employees of a corporation engage in intentional tortious conduct, coverage still exists for the corporation.  *See, e.g., Dart Industries, Inc. v. Liberty Mut. Ins. Co.*, 484 F.2d 1295, 196-99 (9th Cir. 1973) (no bar to coverage for corporation found liable for libel absent proof that corporation's board of directors authorized or ratified the intentional conduct of its president); *Downey*, 66 Cal. App. 4th at 512 (citing *Dart* and holding that while indemnity of an insured who personally commits an act of malicious prosecution is barred, there is no bar for "indemnity of an insured who does not personally commit the act but who is vicariously liable for another person's act of malicious prosecution"); *see also Lujan v. Gordon*, 70 Cal. App. 3d 260, 262 (1977) (all partners in law firm exposed to liability for malicious prosecution as the result of malicious action filed by one partner).  Accordingly, Ironshore cannot avoid its coverage obligations to Stone Meyer based on section 533.

### E.   Stone Meyer Did Not Conceal or Misrepresent Information

Ironshore also suggests that Stone Meyer had knowledge of a potential claim from Ms. Doe and therefore should have disclosed it on the Policy application.  While Ironshore does not expressly deny coverage on this ground, we note that the suggestion is unfounded and absurd.  Under Ironshore's logic, all personal and professional relationships, including client engagements, would have to be disclosed.  Neither the Policy nor California law so requires.

Howard E. Panensky, Esq.
August 7, 2015
Page 7

Even if hindsight might suggest that a matter should have been disclosed, "the failure to mention in an application for insurance the existence of a condition of which the applicant has no knowledge or appreciation is not misrepresentation affecting the validity of the policy." *MacDonald v. Cal.-W. States Life Ins. Co.*, 203 Cal. App. 2d 440, 448 (1962). *See also Miller v. Republic Nat'l Life Ins. Co.*, 789 F.2d 1336, 1340 (9th Cir 1986) ("It would be 'patently unfair' to allow the insurer to avoid its obligations under the policy on the basis of information that the applicant did not know, or alternatively, did not fully understand."). Even if Stone Meyer theoretically had some general awareness of a possible risk, that would not affect its right to coverage. *See, e.g., Wash. Sports & Entm't, Inc. v. United Coastal Ins. Co.*, 7 F. Supp. 2d 1, 11 (D.D.C. 1998) ("[The insureds] may have feared a potential suit, but this concern alone does not convert [the answer in the application] into a material misrepresentation. [The insureds] were obviously wary of a host of circumstances that *could* be a basis for a claim under the policy . . . . Indeed, no one buys insurance unless he is concerned about risks; [the insureds] must have had some concerns, or they would not have paid $500,000 for their insurance. However, there is no evidence that [the insureds] had any knowledge that one of these manifold risks was on the verge of occurrence."). This is so even if such an awareness could "appear troubling under the floodlamp of hindsight." *Id.*

### F.   The "Other Insurance" Provision Does Not Relieve Ironshore

Ironshore cannot escape coverage based on the existence of an "Other Insurance" provision. As a preliminary matter, public policy disfavors this type of "escape clause" where the coverage disappears in the presence of other insurance. *Dart Indus., Inc. v. Commercial Union Ins. Co.*, 28 Cal. 4th 1059, 1079 (2002); *see also Commerce & Indus. Ins. Co. v. Chubb Custom Ins. Co.*, 75 Cal. App. 4th 739, 744 (1999) (when an "excess only" clause is part of a primary liability policy, it is treated the same way as an "escape clause").

Even if Stone Meyer's other insurance policies contain excess "other insurance" clauses, which purport to make each policy excess to any other insurance covering the same loss, California law is clear that "where two or more primary insurers' policies contain excess 'other insurance' clauses purporting to be excess to each other, the conflicting clauses will be ignored and the loss prorated among the insurers on the ground the insured would otherwise be deprived of protection." *Century Sur. Co. v. United Pac. Ins. Co.*, 109 Cal. App. 4th 1246, 1257 (2003). Accordingly, if there are "mutually repugnant" excess "other insurance" clauses, the eligible policies must contribute pro-rata. In any event, the "other insurance" clause applies only between insurers—they do not allow Ironshore (or any other insurer) to pay less than "all sums" due under its policy. *See, e.g., Armstrong World Indus. Inc. v. Aetna Cas. & Sur. Co.*, 45 Cal. App. 4th 1, 78 n.31 (1996) ("As a general rule, insurance policies should be interpreted as if no other insurance is available."); *Shade Foods, Inc. v. Innovative Prods. Sales & Mktg., Inc.*, 78 Cal. App. 4th 847, 908-09 (2000) (bad faith supported by insurer's reliance on an "other insurance" clause as a basis to limit its indemnity duty).

Howard E. Panensky, Esq.
August 7, 2015
Page 8

* * * * *

Ironshore's denial of coverage is wrong and a breach of its duty to Stone Meyer.  Therefore, Stone Meyer
demands that Ironshore withdraw its wrongful denial of coverage and reimburse Stone Meyer for the fees
and costs it has incurred in its defense through July 31, 2015.  That amount is $ 108,553.51.  Please be
advised that Stone Meyer has been defended by Larry Stein and other attorneys at Liner LLP.  Given the
clear conflict of interest created by Ironshore's coverage position, Mr. Stein and Liner will continue to
represent Stone Meyer.  Meanwhile, Stone Meyer reserves all of its rights.

                              Sincerely,



                              Fiona A. Chaney


FC
Enclosure

cc:     Stanton L. Stein, Esq.
        Kirk A. Pasich, Esq.

1  Stanton L. Stein (SBN 45997)
   lstein@linerlaw.com
2  Ashley R. Yeargan (SBN 259523)
   ayeargan@linerlaw.com
3  LINER LLP
   1100 Glendon Avenue, 14th Floor
4  Los Angeles, California 90024.3518
   Telephone:   (310) 500-3500
5  Facsimile:   (310) 500-3501

6  Attorneys for Defendant SMGSB

**CONFORMED COPY**
OF ORIGINAL FILED
Los Angeles Superior Court

JUL 20 2015

Sherri R. Carter, Executive Officer/Clerk
By: Moses Soto, Deputy

7
             **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
8
             **COUNTY OF LOS ANGELES, CENTRAL DISTRICT**
9

10  JANE DOE,                                    Case No. BC578370
11                                               **NOTICE OF ORDER GRANTING**
             Plaintiff,                          **MOTION TO COMPEL ARBITRATION**
12
        vs.                                      Date:     July 17, 2015
13                                               Time:     8:30 a.m.
    NEIL ETTIN MEYER, individually; STONE,       Dept.:    37
14  MEYER, GENOW, SMELKINSON, AND
    BINDER LLP, a California limited liability    Judge:    Honorable Marc Marmaro
15  partnership; and DOES 1 through 100,
    inclusive,
16
                                                 Action Filed:   April 10, 2015
             Defendants.
17

18

19

20

21

22

23

24

25

26

27

28

50666.001-2442609v1

NOTICE OF ORDER GRANTING MOTION TO COMPEL ARBITRATION

**000009**

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that, on July 17, 2015 at 8:30 a.m., in Department 37 of the above-referenced Court, the Court held a hearing on defendant's Motion to Compel Arbitration ("the Motion").

Stanton L. Stein and Ashley R. Yeargan of Liner LLP appeared on behalf of the defendant law firm (the "Firm"), Laura E. Robbins appeared on behalf of defendant Neil Meyer, and Jeffrey Lipow appeared on behalf of the Plaintiff.

After considering the papers filed and oral argument by counsel, the Court ruled as follows:

1. The Motion to Compel Arbitration was GRANTED, subject to the Firm paying all of the arbitration costs;

2. The Court's tentative ruling, attached hereto as Exhibit A, was modified to also apply to defendant Neil Meyer and then was adopted by the Court as its final order;

3. The matter was stayed pending completion of arbitration; and

4. The Court set a post-arbitration status hearing for April 12, 2016.

Dated:  July 20, 2015

LINER LLP

By: _____
     Stanton L. Stein
     Attorneys for Defendant SMGSB

# Exhibit A

Case Number: BC578370   Hearing Date: July 17, 2015   Dept: 37

CASE NAME: Doe v. Meyer, et al.
CASE NO.: BC578370
HEARING DATE: 7/17/15
DEPARTMENT: 37
CALENDAR NO.: 8
TRIAL DATE: None
NOTICE: OK
SUBJECT: Petition to Compel Arbitration
PETITIONER: Defendant Stone, Meyer, Genow, Smelkinson, and Binder LLP
RESPONDENT: Plaintiff Jane Doe

COURT'S TENTATIVE RULING

The motion to compel arbitration is GRANTED, subject to the condition that the Defendant pay all of the arbitration costs.

Counsel for Defendant to give notice.

STATEMENT OF THE CASE

This action arises from alleged improper conduct by an attorney with respect to his former client. The engagement agreement by which the client retained the law firm contained a broadly worded arbitration agreement. In the present motion, the law firm seeks to compel the former client to arbitrate her claims. For the reasons set forth below, the court grants the motion subject to the condition that the law firm pays all costs associated with the arbitration.

As set forth in the complaint, the factual background is as follows. In 1997, Plaintiff moved to California to pursue her acting career and in 2002 was introduced to Defendant Neil Meyer. Plaintiff alleges that Meyer was introduced to her as a highly recommended and

experienced entertainment attorney who could promote her career.

From 2002 to 2015, Meyer and his firm, Defendant Stone, Meyer, Genow, Smelkinson, and Binder LLP (the "Firm") represented Plaintiff. From 2002 to 2006, Plaintiff had a successful career, working on a number of movies and television projects. In 2007, however, after her father suffered a stroke, Plaintiff paused her career to care for her father and spend time with her family. In 2009, when Plaintiff decided to return to her career, her former managers were unwilling to continue representing her. The only member of Plaintiff's former team interested in continuing to represent her was Meyer.

Plaintiff alleges that Meyer and the Firm continued to represent her, but that Meyer abused his position of power over her. Plaintiff felt that she needed help to reestablish her career and believed that Meyer had the power to do so. Plaintiff alleges that from 2009 to 2013 Meyer abused his position as her attorney to pressure her to seek more sexually provocative roles and ultimately intimidated her into entering sexual relationship with him.

Plaintiff filed suit against Meyer and the Firm on April 10, 2015, asserting causes of action for intentional infliction of emotional distress, breach of fiduciary duty, and sexual harassment in violation of Civil Code section 51.9. The complaint alleges that all of the events at issue "occurred solely because of the attorney/ client relationship...." The Firm now moves to compel arbitration pursuant to the arbitration agreement.

DISCUSSION

Code of Civil Procedure section 1281.2 governs motions to compel arbitration. It provides, "On petition of a party to an arbitration agreement alleging the existence of a written agreement to arbitrate a controversy and that a party thereto refuses to arbitrate such controversy, the court shall order the petitioner and the respondent to arbitrate the controversy if it determines that an agreement to arbitrate the controversy exists . . . ." (Code Civ. Proc., § 1281.2.) The right to compel arbitration exists unless the court finds that the right has been waived by a party's conduct, that other grounds exist for the revocation of the agreement, or that a pending court action arising out of the same transaction creates the possibility of conflicting ruling on a common issue of law or fact. (Id. § 1281.2, subds. (a)-(c).)

I. EXISTENCE AND SCOPE OF THE ARBITRATION AGREEMENT

The moving party bears the initial burden of showing an agreement to arbitrate exists. " 'Because the existence of the agreement is a statutory prerequisite to granting the petition, the petitioner bears the burden of proving its existence by a preponderance of the evidence.' " (Mitri v. Arnel Management Co. (2007) 157 Cal.App.4th 1164, 1169.) Here, the Firm presents evidence that on February 4, 2003, Plaintiff executed a retainer agreement with the Firm that included an arbitration clause. The clause provides as follows:

IN THE EVENT OF A DISPUTE BETWEEN YOU AND US REGARDING FEES, COSTS OR ANY OTHER MATTER RELATED TO OR ARISING OUT OF YOUR ENGAGEMENT OF US, OR YOUR OR OUR PERFORMANCE OF THE AGREEMENT PURSUANT TO WHICH OUR SERVICES ARE PERFORMED, INCLUDING, WITHOUT LIMITATION, THE QUALITY OF THE SERVICES WHICH WE RENDER AND ANY CLAIMS OF MALPRACTICE, THE DISPUTE SHALL BE DETERMINED, SETTLED AND RESOLVED BY CONFIDENTIAL ARBITRATION IN LOS ANGELES, CALIFORNIA PURSUANT TO THE COMMERCIAL RULES OF THE AMERICAN ARBITRATION ASSOCIATION BEFORE A RETIRED LOS ANGELES SUPERIOR COURT JUDGE FROM THE THEN CURRENT LIST OF SUCH RETIRED JUDGES. Without limiting the generality of the foregoing, the parties expressly agree that any and all questions as to whether or not an issue constitutes a dispute or other matter arbitrable under this section shall themselves be settled by arbitration in accordance with this section. Any award shall be final, binding and conclusive upon the parties, and a judgment rendered thereon may be entered in any court having jurisdiction thereof. By agreeing to arbitration hereunder, you and we are waiving a right to trial in a court and by a jury.

(Declaration of Douglas R. Stone, Exh. A, ¶ 8.)

As the Firm notes, courts have found arbitration clauses included in attorney-client engagement agreements, such as the one at issue here, enforceable. (E.g., Powers v. Dickerson Carlson & Campillo (1997) 54 Cal.App.4th 1102, 1115 ["The arbitration provisions in this case are enforceable as to legal malpractice claims"].) As the Powers court discussed, the California State Bar also approves the practice of including arbitration provisions in attorney-client engagement agreements: " '[T]he Committee reaffirms the principle that there is nothing ethically improper with including an arbitration provision in the initial attorney-client retainer agreement by which the attorney-client relationship is first established. The extent to which the client is aware of the provision and freely consents to it goes to the legal enforceability of the agreement, not its ethical propriety.' " (Id. at p. 1113.)

In opposition to the motion, Plaintiff does not dispute that she signed the agreement containing this provision or that such an agreement is

enforceable. Rather, Plaintiff contends that her causes of action are not subject to the arbitration clause and that, even if they were, the clause is unconscionable. Plaintiff's first argument goes to the scope of the arbitration clause. She argues that the Firm cannot reasonably maintain that her claims are subject to the clause and has failed to present any evidence that the claims at issue here were contemplated at the time the parties executed the agreement.

In general, "[t]he scope of arbitration is . . . a matter of agreement between the parties." (Ericksen, Arbuthnot, McCarthy, Kearney & Walsh, Inc. v. 100 Oak Street (1983) 35 Cal.3d 312, 323.) In California, an arbitrator " 'may . . . be given the power to determine his own jurisdiction, i.e., to determine the arbitrability of a dispute. . . . If the agreement provides for an arbitrator to decide arbitrability, the court may not decide the issue.' " (Merrick v. Writers Guild of America, West, Inc. (1982) 130 Cal.App.3d 212, 218; see also Knutsson v. KTLA, LLC (2014) 228 Cal.App.4th 1118, 1131 ["An exception to the rule that the court decides [the issue of arbitrability] in a collective bargaining agreement dispute is when the parties clearly and unmistakably agree the arbitrator is to decide the arbitrability issue"].)

The arbitration agreement in this case is broad and is not limited to legal malpractice or financial claims. The arbitration clause's language applies to any "matter related to or arising out of your engagement of us, or your or our performance of the agreement pursuant to which our services are performed, including, without limitation, the quality of the services which we render and any claims of malpractice." As noted above, the complaint makes clear that all of the claims are based on the attorney/ client relationship. For that reason, Plaintiff's causes of action are likely within the ambit of the agreement. However, in this case the parties agreed that the arbitrator – and not the court – would ultimately decide that issue. Here, by executing the agreement, the parties expressly agreed "that any and all questions as to whether or not an issue constitutes a dispute or other matter arbitrable under this section shall themselves be settled by arbitration in accordance with this section." In other words, the parties agreed that an arbitrator would decide the issue of arbitrability of the claims at issue. This is particularly true considering Plaintiff's allegation in her own complaint that "[a]ll of the events alleged hereinabove occurred solely because of the attorney/client relationship between MEYER and STONEY MEYER on the one part, and Plaintiff on the other." (Compl. ¶ 26.)

Accordingly, the court finds there is an agreement to arbitrate, but does not decide whether the scope of the arbitration clause encompasses Plaintiff's claims. The only issue remaining is whether the agreement is unconscionable.

II. UNCONSCIONABILITY

Both procedural and substantive unconscionability are required to invalidate an arbitration clause. (Armendariz v. Foundation Health Psychcare Services, Inc. (2000) 24 Cal.4th 83, 113-114.) Procedural unconscionability focuses largely on oppression and the manner in which the agreement was negotiated; substantive unconscionability focuses on the terms of the agreement and the presence of overly harsh or one-sided results. (Ibid.) The two components need not be present to the same degree. Rather, the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa. (Ibid.)

A. Procedural Unconscionability

Procedural unconscionability generally concerns the manner in which the contract was negotiated and the circumstances of the parties at the time. (Nyulassy v. Lockheed Martin Corp. (2004) 120 Cal.App.4th 1267, 1281.) "It focuses on factors of oppression and surprise. The oppression component arises from an inequality of bargaining power of the parties to the contract and an absence of real negotiation or a meaningful choice on the part of the weaker party." (Ibid.) While the fact that an arbitration clause is adhesive does not as a matter of law render it unenforceable (McManus v. CIBC World Markets Corp. (2003) 109 Cal.App.4th 76, 91), "[w]hen the weaker party is presented the clause and told to 'take it or leave it' without the opportunity for meaningful negotiation, oppression, and therefore procedural unconscionability, are present." (Szetela v. Discovery Bank (2002) 97 Cal.App.4th 1094, 1100).

Plaintiff contends that Defendants presented her the retainer agreement on a take-it-or-leave-it basis without engaging in any discussion about the arbitration clause. Plaintiff contends that she had no understanding of the meaning and import of the clause and that Defendants had superior knowledge and bargaining power over her. For these reasons, Plaintiff concludes that the process leading to the execution of the agreement was procedurally unconscionable.

In response, the Firm points out that the arbitration provision is conspicuous in that it is set forth in its own paragraph and in all capital letters. The agreement itself is brief, four pages in length. Moreover, the agreement includes a provision that Plaintiff was advised to seek independent legal counsel: "you acknowledge that you have been advised to seek independent legal and business advice with respect to this agreement and that you have either sought and obtained such advice or deliberately refrained from doing so." (Stone Decl., Exh. A, ¶ 10.) The Firm also contends that Plaintiff was in a position to negotiate the terms of the agreement as she was not required to retain the

LASC - Tentative Rulings

Firm but was free to seek other counsel.

In light of the conspicuous nature of the arbitration clause and the fact that it would have been an easy matter to have independent counsel review the agreement, Plaintiff cannot persuasively claim any surprise as to the existence or meaning of the arbitration clause. Although Plaintiff asserts that the clause was included in the agreement on a take-it-or-leave-it basis, Plaintiff was under no obligation to retain the Firm. Rather, she could look elsewhere for counsel, and this freedom likely gave her some leverage to negotiate the terms of the agreement. These considerations notwithstanding, Plaintiff, an aspiring actor, was at the "bargaining table" with a law firm experienced in representing clients in the entertainment industry. This suggests some slight indicia of procedural unconscionability.

B. Substantive Unconscionability

In assessing substantive unconscionability, courts generally focus on the terms of the agreement and look for terms that are unfairly one-sided such that they "shock the conscience." (Nyulassy, supra, 120 Cal.App.4th at p. 1281.) The "paramount consideration" is mutuality of the obligation to arbitrate. (Id. at pp. 1281, 1287.)

Plaintiff contends that the agreement is substantively unconscionable because it requires her to pay her share of the arbitration fee. Plaintiff also asserts that she had no understanding that she would be waiving her access to the courts or a jury, and would be required to pay her portion of the arbitration costs. The arbitration clause expressly states that by executing the agreement "you and we are waiving a right to trial in a court and by a jury." The waiver of a right to trial in a court and by a jury was mutual, and it was conspicuous. That Plaintiff failed to read or understand the agreement does not demonstrate that its terms are substantively unconscionable. Parties to arbitration agreements cannot "contend that the arbitration provisions are unenforceable because they did not carefully read the agreements, did not understand the significance of the arbitration provisions, and did not knowingly waive their right to a jury trial in a legal malpractice action. As a general rule, such arguments may not be used to invalidate a written arbitration provision." (Powers, supra, 54 Cal.App.4th at p. 1109.)

The issue of costs is somewhat different given Plaintiff's civil rights claim and the fact that she asserts that she is now destitute. There is nothing per se unreasonable about cost sharing in the typical case. California law provides "[u]nless the arbitration agreement otherwise provides or the parties to the arbitration otherwise agree, each party to the arbitration shall pay his pro rata share of the expenses and fees of the neutral arbitrator..." C.C.P. § 1284.2. By creating this default rule without mention of indigent plaintiffs, the Legislature did not find cost splitting inherently problematic in arbitration. It is also mutual.

Plaintiff's third cause of action is for sexual harassment in violation of Civil Code 51.9, which is a civil rights claim. In a different, but somewhat analogous, setting the California Supreme Court has addressed whether employees may be required to pay the costs of arbitration in the context of claims asserted under the Fair Employment and Housing Act ("FEHA"). (Armendariz, supra, 24 Cal.4th at pp. 107-113.) In that context, the Court determined that "when an employer imposes mandatory arbitration as a condition of employment, the arbitration agreement or arbitration process cannot generally require the employee to bear any type of expense that the employee would not be required to bear if he or she were free to bring the action in court." (Id. at pp. 111-112.) The Court explained that "[t]his rule will ensure that employees bringing FEHA claims will not be deterred by costs greater than the usual costs incurred during litigation, costs that are essentially imposed on an employee by the employer." (Ibid.)

Like FEHA and many other statutory civil rights, Civil Code § 51.9 was added in 1994, well after C.C.P. § 1284.2. Given the attorney fees shifting already in place for civil rights claims, (see Civil Code §52 (b)(3)), requiring Plaintiff to pay for the arbitration process for her sexual harassment claim would seem contrary to the above policy articulated by the Supreme Court. While there is no case on point, the provision relating to costs could be viewed as unconscionable and the court's inclination is to sever the cost sharing provision as a condition to the granting of this motion. The parties should be prepared to discuss this issue at the hearing.

In sum, the agreement is enforceable and is not unconscionable. The motion to compel arbitration is GRANTED, subject to the Firm paying all of the arbitration costs. The action will be stayed pending completion of the arbitration.

---

1. As set for in the text at page 3 above, an arbitration agreement may provide for the arbitrator to decide arbitrability of claims. The agreement in this case clearly provides that the arbitrator is to make the decision about whether a claim is subject to the arbitration agreement. That notwithstanding, the court assumes that it has a "gatekeeper" function to ensure that the agreement would reasonably provide for the arbitration of the claims, which the court concludes that it does.

2. The court notes that the Firm has expressed a willingness to pay some, if not all, of the costs of arbitration.

1                           **PROOF OF SERVICE**

2 **STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

3         At the time of service, I was over 18 years of age and not a party to this action. I am
employed in the County of Los Angeles, State of California. My business address is 1100
4 Glendon Avenue, 14th Floor, Los Angeles, CA 90024.3518.

5         On July 20, 2015, I served true copies of the following document(s) described as **NOTICE
OF ORDER GRANTING MOTION TO COMPEL ARBITRATION** on the interested parties
6 in this action as follows:

7     Attorneys Defendant for Neil Meyer         Attorneys for Plaintiff JANE DOE

8     Mark Baute, Esq.                        Jeffrey A. Lipow
    Baute Crochetiere & Gilford LLP         Lipow & Harris
9     777 South Figueroa Street, Suite 4900    18801 Ventura Boulevard, Suite 208
    Los Angeles, California 90017            Tarzana, California 91356
10    Telephone: (213) 784-6615             Telephone: (818) 905-0507

11         **BY MAIL:** I enclosed the document(s) in a sealed envelope or package addressed to the
persons at the addresses listed in the Service List and placed the envelope for collection and
12 mailing, following our ordinary business practices. I am readily familiar with Liner LLP's practice
for collecting and processing correspondence for mailing. On the same day that correspondence is
13 placed for collection and mailing, it is deposited in the ordinary course of business with the United
States Postal Service, in a sealed envelope with postage fully prepaid. I am a resident or employed
14 in the county where the mailing occurred. The envelope was placed in the mail at Los Angeles,
California.

15         I declare under penalty of perjury under the laws of the State of California that the
16 foregoing is true and correct.

17         Executed on July 20, 2015, at Los Angeles, California.

18

19                                              _Coreen Funtanilla_
20                                              Coreen Funtanilla

21

22

23

24

25

26

27

28

LINER LLP
1100 Glendon Avenue | 14th Floor
Los Angeles, CA 90024-3518

50666.001-2442609v1

           NOTICE OF ORDER GRANTING MOTION TO COMPEL ARBITRATION